UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                              Chapter 7

Michael George Hermoyian,                           Case No. 10-44423

        Debtor.                                     Hon. Phillip J. Shefferly
_____/

John Tweedie,                                       Adversary Proceeding No. 10-05607-PJS

        Plaintiff,

v.

Michael George Hermoyian,

        Defendant.
_____/

### <u>Opinion Granting Judgment Of Non-Dischargeable Debt</u>

### <u>Introduction</u>

Michael George Hermoyian is the Debtor in this Chapter 7 bankruptcy case. John Tweedie

brought this adversary proceeding against him seeking a determination of non-dischargeability of

debt alleged to be owed by the Debtor to Tweedie under § 523(a)(2)(A), (4), and (6) of the

Bankruptcy Code. After a two day trial, the Debtor and Tweedie each filed a post-trial brief. The

Court has reviewed the joint final pretrial order, the trial testimony, the transcript, the exhibits

admitted during the trial, and the parties' post-trial briefs. After carefully reviewing and weighing

all of the evidence in the record, the Court concludes that Tweedie is entitled to a judgment against

the Debtor holding that the sum of $310,987.00 is a non-dischargeable debt. The following

constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

**Jurisdiction**

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). Tweedie's non-dischargeability of debt claims under 11 U.S.C. § 523(a)(2)(A), (4), and (6) are core proceedings under 28 U.S.C. § 157(b)(2)(I).

**Background Facts**

The Debtor and Tweedie were boyhood friends who lived in the same neighborhood. Over the years, they remained friends and stayed in contact. Beginning in the 1970s, the Debtor made his living in the vending machine business, selling candy, coffee, cigarettes, soft drinks and other products. His business also provided a coffee service to offices and other businesses. Although he had partners for many years, after 1996 the Debtor owned and operated his own vending business, AIM Vending & Coffee Service, Inc., located in Farmington Hills, Michigan. Tweedie made his living in the heating, cooling and refrigeration business. Although Tweedie had moved to northern Michigan, he did some work with the Debtor over the years by assisting with the installation of vending machines for the Debtor.

In 2005, the Debtor and Tweedie began to do some new business together. The Debtor's vending business had been deteriorating for some time and the Debtor had learned of an opportunity to sell juice products for making slushes for sale in schools, which came about because of the passage of certain legislation restricting the sale of carbonated beverages in schools. Also, the juice products could be sold for making alcoholic drinks at other event locations. After the Debtor learned

-2-

of these juice products and the potential opportunities for them, he met with the owner of a franchise business known as Breeze Freeze, Inc. ("Breeze Freeze") to discuss the possibility of purchasing franchises for the sale of these juice products. Because of Tweedie's background in the cooling and refrigeration business, the Debtor spoke to Tweedie about the possibility of Tweedie getting into this business with the Debtor by providing funds to purchase and operate franchises selling Breeze Freeze products.

Beginning in late 2005, and continuing over the next two years, Tweedie provided funds to the Debtor for the purchase of equipment and franchises to sell Breeze Freeze products. Tweedie obtained those funds by borrowing from Alden State Bank. All told, from 2005 through 2007, Tweedie "advanced" funds to the Debtor on six separate occasions in the aggregate sum of $363,297.58. Tweedie also made one advance directly to one of the Debtor's companies, in the amount of $15,000.00. Unfortunately, at the time that Tweedie made these advances, the Debtor and Tweedie prepared little, if any, documentation to memorialize the terms of their agreement regarding the funds advanced by Tweedie.[1] Even though they did not document their relationship regarding these advances, they did orally agree that the Debtor would make payments directly to Alden State Bank on the loans made by the bank to Tweedie. Using the funds advanced by Tweedie, as well as his own funds and funds that he received from his mother, the Debtor purchased two Breeze Freeze

---

[1] Although the Debtor later arranged for the preparation and execution of various promissory notes, security agreements and other documents, the only document initially made was a letter agreement (Exhibit LLLL) on the letterhead of AIM Vending & Coffee Service, Inc. that was signed by the Debtor and Tweedie. The letter agreement does not refer to Tweedie's advance as either a loan or a capital investment. It states only that if the Debtor suffers an "unexpected tragedy," Tweedie should be paid back with 8% interest.

franchises covering territories in southeastern Michigan and the necessary equipment to operate those franchises.

Although Tweedie intended that the funds he advanced were to be used for the juice business, and not for the Debtor's vending business at AIM Coffee & Vending Service, Inc., the Debtor did not initially create a separate legal entity for the juice business. Instead, the Debtor used his existing vending business entity as the vehicle for entering into the new juice business and ran both businesses out of one checkbook. Funds for the juice business were deposited with AIM Vending & Coffee Service, Inc., and that business entity paid the bills both for the vending business and the juice business. Although the juice business was not transacted by a separate legal entity, the Debtor named the juice business AIM Breeze Freeze. The Debtor ran the juice business from the same location in Farmington Hills that his vending business, AIM Coffee & Vending Service, Inc., operated from. The Debtor and Tweedie spoke regularly, and Tweedie helped the Debtor select and install the juice equipment, but Tweedie was not involved in the day-to-day running of the juice business.

After purchasing the first two franchises, the Debtor looked into acquiring other Breeze Freeze franchises. The Debtor became aware of an opportunity to purchase the rights to sell Breeze Freeze juice products at the Palace of Auburn Hills and at the DTE Amphitheater. At that time the juice products were being sold by Breeze Freeze itself in those venues rather than through franchisees. The Debtor spoke to Tweedie about advancing more money to purchase the rights to sell Breeze Freeze juice products at those venues. Tweedie took out more loans from Alden State Bank to obtain funds and advanced those funds in May, 2006 for the Debtor to purchase the rights and the equipment to sell Breeze Freeze juice products at these venues. Again, no documentation

-4-

was drawn up to memorialize the agreement between the Debtor and Tweedie with respect to these advances and with respect to Tweedie's rights to repayment.  It is not entirely clear from the record but it appears that the Debtor again used AIM Coffee & Vending Service, Inc. to conduct the juice business at the Palace of Auburn Hills and at the DTE Amphitheater, even though he had also created a separate legal entity under the name of AIM Breeze Freeze, LLC in April, 2006.  The funds advanced by Tweedie to the Debtor for the juice business were not deposited in a separate legal entity, but instead were deposited with AIM Vending & Coffee Service, Inc., which then used a portion of those funds for the juice business.  The Debtor freely admitted that AIM Vending & Coffee Service, Inc. did not segregate Tweedie's funds from its own revenue, and used Tweedie's funds, as well as its own revenue, to pay its bills and to pay the bills incurred in the juice business.

The juice business subsequently acquired other commercial accounts that generated revenue for it.  Tweedie advanced additional funds.  However, problems developed in the juice business.  One of the large accounts in the juice business was Rock Financial, an entity involved in the mortgage business.  When the mortgage industry deteriorated in 2007, Rock Financial laid off a large number of individuals and, in an effort to reduce the cost of the benefits to its employees, returned to the Debtor the juice product equipment that the Debtor had placed in Rock Financial's offices.  That caused a substantial loss of revenue in the juice business.  Also, sales were significantly reduced at the Debtor's other locations.  Sales at the Palace of Auburn Hills dropped in 2008 to one-half or less from the previous years.  Similarly, sales at the DTE Amphitheater dropped down to one-third of what they had previously been.  Further, the owner of Breeze Freeze, the franchisor of Breeze Freeze products, was charged with a number of criminal activities, which affected Breeze Freeze's relationship with the Debtor's juice business.  As a result, there were

interruptions in the purchase of product and a need for additional funds. Meanwhile, AIM Vending & Coffee Service, Inc. continued to experience its own difficulties in the vending business. By mid-2007, because of a dispute with Coca Cola, AIM Vending & Coffee Service, Inc. lost virtually all of its business. It was forced to liquidate its business assets.

For the first time, the Debtor now attempted to separate the juice business that he had entered into with Tweedie from his failing vending business. The Debtor took steps with an attorney and an accountant to split apart the juice business from the vending business. The Debtor created a new entity, Tropical Breeze, Inc., in addition to the existing entity AIM Breeze Freeze, LLC, to separate the juice business from the vending business. The Debtor arranged to have a number of documents (Exhibits T through Z and AA) drawn up to accomplish this separation. They included a bill of sale, promissory notes, security agreements and other documents that pertained to the advances made by Tweedie as well as to other advances of funds made by the Debtor and the Debtor's mother into the juice business. As the Debtor attempted to belatedly memorialize the terms of repayment to himself, Tweedie, and the Debtor's mother, some of the documents that were drawn up, including a number of the promissory notes (Exhibits T and U), and at least one security agreement (Exhibit X), were backdated to May 2006. To accomplish a transfer of the juice business assets, the Debtor also arranged for the drafting and execution of a bill of sale (Exhibit Z) on September 2, 2007. The bill of sale was made by AIM Breeze Freeze, LLC and indicates in it that AIM Vending & Coffee Service, Inc. is the parent of AIM Breeze Freeze, LLC. The bill of sale purports to transfer the juice equipment of AIM Breeze Freeze, LLC to the newly founded entity, Tropical Breeze, Inc. The bill of sale contains a release by Tweedie of AIM Breeze Freeze, LLC and AIM Vending & Coffee Service, Inc., conditioned upon a transfer of good title of the juice business assets to Tropical

-6-

Breeze, Inc. On September 28, 2007, the Debtor signed an agreement on behalf of all three of these entities purporting to "assign" the debts owed to Tweedie by AIM Vending & Coffee Service, Inc. and AIM Breeze Freeze, LLC to Tropical Breeze, Inc. (Exhibit AA).

By mid-2008, with the vending business entirely shut down and the juice business in trouble, the Debtor and Tweedie decided to have the Debtor purchase a life insurance policy in an effort to somehow protect the money advanced for the juice business by Tweedie, the Debtor, and the Debtor's mother. However, because of health issues, the Debtor was unable to qualify for the insurance policy. In September 2008, Tweedie was in Kansas City retrieving juice equipment from one of the juice business locations. When he returned on September 28, 2008, he indicated that he no longer wanted anything to do with the Debtor.

Throughout all of this time, even while the vending and juice businesses were failing, the Debtor, through his various companies, made the monthly payments to Alden State Bank on the loans that Tweedie had obtained from it. Although the details are not entirely clear in the record, the Debtor continued to issue checks to Alden State Bank as late as November, 2008 (Exhibit S), but they were not honored by Alden State Bank. When that happened, the Debtor stopped payment on those checks and did not make any further payments. The loans were now mature. The Debtor did not have the funds to pay them, either directly or through his companies.

### The State Court Lawsuit

On January 16, 2009, Alden State Bank filed suit against Tweedie in the Circuit Court for the County of Antrim, State of Michigan, case no. 2009-8445-CK ("State Court Lawsuit") to collect on the loans that it had made to him. Tweedie, in turn, filed a third-party complaint in the State Court Lawsuit against the Debtor, the Debtor's girlfriend, Betty Semeniuk, and against four separate

-7-

entities owned or controlled by the Debtor, AIM Vending & Coffee Service, Inc.; AIM Breeze Freeze, LLC; Tropical Breeze, Inc.; and Cool Breeze Enterprises, Ltd. (collectively, the "Debtor's Companies"). On November 16, 2009, Tweedie filed a second amended third-party complaint ("State Court Complaint") (Exhibit 503) that contained 17 separate counts against the Debtor, Semeniuk and the Debtor's Companies. The State Court Complaint included counts for repayment of loans, breach of contract, breach of common law and statutory fiduciary duties, conversion, fraud and more. After the close of discovery and the completion of pretrial proceedings, and only five days before the State Court Lawsuit was scheduled for a jury trial, Tweedie, the Debtor, Semeniuk and the Debtor's Companies reached an agreement to submit all of their disputes in the State Court Lawsuit to binding arbitration pursuant to the Michigan Arbitration Act, Mich. Comp. Laws Ann. §§ 600.5001 - .5035. On January 22, 2010, based upon the stipulation of the parties, the Antrim County Circuit Court entered an order compelling arbitration ("Arbitration Order") (Exhibit 505). Pursuant to the terms of the Arbitration Order, Tweedie, the Debtor, Semeniuk, and the Debtor's Companies agreed that William E. Clark ("Arbitrator") would be the arbitrator. The arbitration was then scheduled to begin on March 15, 2010.

Before the arbitration began, the Debtor and Semeniuk each filed a Chapter 7 bankruptcy petition on February 16, 2010. As a result, the arbitration did not go forward as to them. However, it did go forward with respect to Tweedie's claims against the Debtor's Companies, because none of them were debtors in a bankruptcy case. The arbitration continued for four and one-half days, until March 23, 2010, when each of the Debtor's Companies filed their own Chapter 7 bankruptcy petition just before the arbitration was scheduled to conclude.

On May 21, 2010, Tweedie filed this adversary proceeding seeking a determination that the Debtor owed a non-dischargeable debt to him and seeking to deny the Debtor a discharge. On June 17, 2010, Tweedie filed a motion for relief from the automatic stay under § 362(d)(1) of the Bankruptcy Code, so that Tweedie could proceed to arbitrate his claims against the Debtor pursuant to the Arbitration Order. The Court granted Tweedie's motion to lift the automatic stay to permit the arbitration to go forward. The Debtor moved to vacate the order lifting the automatic stay. On August 24, 2010, the Court issued an opinion denying the Debtor's motion. The opinion explained that the stay was lifted to permit the arbitration to determine whether there is a debt owing by the Debtor to Tweedie and, if so, what is the amount of the debt. The opinion further explained that the determination of non-dischargeability of any debt found by the Arbitrator would be made solely by the Bankruptcy Court.

The arbitration resumed on September 14, 2010 with respect to Tweedie's claims against the Debtor and his claims against Semeniuk.[2] On the first day, Tweedie dismissed six of the counts in the State Court Complaint. The arbitration then proceeded with respect to the remaining counts. The arbitration lasted three days. There is no transcript of the arbitration. The Arbitrator found that there was a debt owing by the Debtor to Tweedie, and determined the amount of that debt. On November 1, 2010, the Arbitrator issued an award ("Arbitration Award") (Exhibit 501) in the amount of $5,442,846.47 in favor of Tweedie and against the Debtor and Semeniuk, jointly and severally. The Arbitration Award is a 36 page document that contains 110 findings of fact, 14 conclusions of law, and a calculation of damages. On November 8, 2010, the Antrim County

---

[2] An order lifting the automatic stay was entered on August 30, 2010 by the Bankruptcy Court in Semeniuk's Chapter 7 bankruptcy case no. 10-44396.

Circuit Court entered a judgment ("Judgment") (Exhibit 502) confirming the Arbitration Award in favor of Tweedie.

## The Adversary Proceeding

Meanwhile, the adversary proceeding brought by Tweedie against the Debtor continued to move forward. On December 7, 2010, after conferring with both counsel for Tweedie and the Debtor, the Court entered an adversary proceeding scheduling order that approved the parties' Rule 26(f) conference report and set a trial calendar based upon that report. In their Rule 26(f) report, Tweedie and the Debtor agreed that all potentially dispositive motions would be filed by May 1, 2011. The Court approved that date. Consistent with its normal scheduling practices, and to ensure that there would be enough time to hear and decide any timely filed dispositive motions before the final pretrial conference and trial, the Court scheduled the final pretrial conference for August 22, 2011, and the trial for August 31, 2011.[3] Neither party filed any potentially dispositive motion.

Although Local Bankruptcy Rule 7016-1(a) requires the preparation and submission of a joint final pretrial statement and proposed order seven days prior to the final pretrial conference, Tweedie and the Debtor did not submit a joint final pretrial statement and proposed order to the

---

[3] On April 26, 2011, Tweedie and the Debtor stipulated to extend the deadline for filing potentially dispositive motions. The Court approved that stipulation and entered an order extending the deadline to July 8, 2011. Although a tight schedule, that would still leave enough time before the trial for the Court to hear and decide any timely filed potentially dispositive motions. But neither Tweedie nor the Debtor filed any potentially dispositive motions by such date. Instead, they filed another stipulation seeking to extend the deadline to file potentially dispositive motions until July 31, 2011. Because the stipulation did not offer any reason for this extension, and because of the looming trial date of August 31, 2011, the Court found that there was not sufficient cause to extend the deadline to the new date requested by Tweedie and the Debtor. The Court entered an order denying the requested extension.

Court before the scheduled final pretrial conference. Despite this fact, the Court proceeded with the final pretrial conference on August 22, 2011 and reviewed those portions of the proposed joint final pretrial order that each of the parties brought with them to the final pretrial conference. During the conference, counsel for the Debtor and counsel for Tweedie disagreed regarding the effect the Arbitration Award's findings of fact should have in this adversary proceeding. Although neither the Debtor nor Tweedie had previously filed any motion seeking a ruling on this issue, and it was now the eve of the scheduled trial, the Court permitted each of them to file a memorandum setting forth their positions on this issue. The Court continued the final pretrial conference until August 26, 2011 so that it could review their memoranda and make a pretrial ruling on this issue.

On August 26, 2011, the Court held the adjourned conference. After considering the parties' memoranda, the Court ruled in favor of Tweedie and held that the findings of fact made by the Arbitrator in the Arbitration Award are binding upon this Court, but only to the extent that applicable principles of collateral estoppel make them binding. The Court also ruled that even if applicable principles of collateral estoppel do make the Arbitration Award's findings binding upon this Court, the determination of whether those findings are sufficient to establish a non-dischargeable debt would be made solely by this Court.

The Court then reviewed with the parties their portions of the proposed joint final pretrial order. Tweedie identified one "will call" witness in the joint final pretrial order and identified 30 other individuals as "may call" witnesses. The Debtor identified five "will call" witnesses in the joint final pretrial order and identified 14 other individuals as "may call" witnesses. Tweedie and the Debtor also stipulated to sever Tweedie's objection to the Debtor's discharge under § 727 of the Bankruptcy Code so that the trial would go forward only with respect to Tweedie's request for a

-11-

non-dischargeable debt under § 523 of the Bankruptcy Code.  On August 30, 2011, the Court entered a joint final pretrial order (docket entry no. 85).  On August 31, 2011, the trial began.

Surprisingly, in light of the substantial number of witnesses identified by the parties in the joint final pretrial order, only one witness testified.  Tweedie called no witnesses.  Tweedie's entire case in chief consisted of putting seven exhibits into evidence:  exhibits 501, 502, 503, 503a, 503b, 503c, and 505.  The Debtor called himself as his only witness.  The Debtor also put into evidence his own exhibits A through P, R through Z, AA, EE (for a limited purpose), FF (for a limited purpose), KK, LL, NN, QQ, AAA, BBB, PPP, VVV through ZZZ, JJJJ (for a limited purpose), KKKK (for a limited purpose), and LLLL.[4]  At the conclusion of the trial, Tweedie requested that the Court find that the entire amount of the Arbitration Award of $5,442,846.47 is non-dischargeable under § 523(a)(2)(A), (4), and (6) of the Bankruptcy Code.  The Debtor requested dismissal of Tweedie's complaint.

---

[4] Tweedie made two standing evidentiary objections during the Debtor's proofs, each of which was based on the Arbitration Award.  First, Tweedie objected to the Debtor either testifying or introducing exhibits to refute the findings of fact in the Arbitration Award.  Second, Tweedie objected to all of the Debtor's testimony and exhibits on relevance grounds.  Because Tweedie had introduced the Arbitration Award into evidence on the morning of the first day of the trial, the Court had not yet fully reviewed the entire Arbitration Award at the time that Tweedie made these two objections.  The Court therefore took the two objections under advisement and permitted the trial to continue.  The Court has now had the opportunity to thoroughly review all of the findings of fact and conclusions of law set forth in the Arbitration Award and has fully considered Tweedie's two objections.  For the reasons explained in the section of this opinion that discusses collateral estoppel principles, the Court hereby sustains Tweedie's first objection and disregards any of the Debtor's testimony and exhibits to the extent that they are offered to refute those findings of fact in the Arbitration Award that are binding upon this Court pursuant to the principles of collateral estoppel.  The Court hereby overrules Tweedie's second objection to the extent that it objects to the balance of the Debtor's testimony and exhibits about either background facts or facts that were not specifically found by the Arbitrator.

## Burden of Proof

The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is "the ordinary preponderance of the evidence standard." Grogan v. Garner, 498 U.S. 279, 291 (1991); Rembert v. AT & T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998). "In order to except a debt from discharge, a creditor must prove each of [the] elements [of non-dischargeability] by a preponderance of the evidence." In re Rembert, 141 F.3d at 281 (citations omitted). "Further, exceptions to discharge are to be strictly construed against the creditor[,]" id. (citation omitted), and instead "are to be strictly construed in favor of the debtor," United States v. Hindenlang (In re Hindenlang), 164 F.3d 1029, 1034 (6th Cir. 1999) (citation omitted).

## Collateral Estoppel Principles

According to Tweedie, this Court is bound by principles of collateral estoppel to accept the findings of fact contained in the Arbitration Award. Tweedie argues that the Arbitrator's findings in the Arbitration Award are sufficient by themselves to meet Tweedie's burden to prove by a preponderance of the evidence each and every element of a non-dischargeable debt under § 523(a)(2)(A), (4), and (6) of the Bankruptcy Code. The Debtor asserts that the Court is not bound to accept the Arbitrator's findings in the Arbitration Award. The Debtor also argues that even if the Court is required to accept those findings, the Arbitrator's findings in the Arbitration Award are not by themselves sufficient to meet Tweedie's burden under § 523(a)(2)(A), (4) or (6).

The starting point to determine whether Tweedie has met his burden of proof is understanding what findings, if any, this Court must accept in the Arbitration Award. The Full Faith and Credit Clause of the United States Constitution and its implementing statute, 28 U.S.C. 1738, require "federal courts to give full faith and credit to the judicial proceedings of state courts." Bay

-13-

Area Factors v. Calvert (In re Calvert), 105 F.3d 315, 317 (6th Cir. 1997).  Application of collateral estoppel principles to the determination of non-dischargeable debt under § 523(a) must "begin with the fundamental principle that 'judicial proceedings [of any court of any state] shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken.'"  Rally Hill Productions, Inc. v. Bursack (In re Bursack), 65 F.3d 51, 53 (6th Cir. 1995) (quoting 28 U.S.C. § 1738).

In Spilman v. Harley, 656 F.2d 224 (6th Cir. 1981), the Sixth Circuit Court of Appeals held that principles of collateral estoppel do apply to determinations of non-dischargeability of debt by a bankruptcy court.

> The determination whether or not a certain debt is dischargeable is a legal conclusion based upon the facts in the case.  The bankruptcy court has the exclusive jurisdiction to make the legal conclusion.  It must apply the statute to the facts and decide to discharge or not. . . .  However, that Congress intended the bankruptcy court to determine the final result [dischargeability or not] does not require the bankruptcy court to redetermine all the underlying facts.

Id. at 227.

The Spilman court explained the policy behind applying collateral estoppel principles to non-dischargeability actions in bankruptcy court.

> Collateral estoppel is applied to encourage the parties to present their best arguments on the issues in question in the first instance and thereby save judicial time.  There is no reason to suppose that parties will not vigorously present their case on issues necessary to the state court proceeding or that the bankruptcy court will be any more fair or accurate than the state court in the determination of the facts.  Thus, there is no reason to allow relitigation of facts previously litigated which were necessary to the outcome of that prior litigation.  This Court holds that where all the requirements of collateral estoppel are met, collateral estoppel should preclude relitigation of factual issues.

Id. at 228.

-14-

However, while it is true that collateral estoppel principles apply to non-dischargeability actions, bankruptcy courts are not required to give preclusive effect to contradictory or inconsistent findings of fact.  In Sanderson Farms, Inc. v. Gasbarro, No. 07-4252, 2008 WL 4764118 (6th Cir. Oct. 24, 2008), the Sixth Circuit Court of Appeals affirmed a bankruptcy court's refusal to give preclusive effect to contradictory findings of fact.

> The state trial court's findings regarding § 523(a)(2)(A) [were] internally inconsistent regarding whether [the debtor] committed fraud.  At one point, the state trial court stated that it was "not convinced that any of the [d]efendants intentionally defrauded the [p]laintiff at the time the product was ordered[.]"  It also found, however, that "[p]laintiff suffered an unjust loss in the amount of $118,214.50 because of the domination, control, and fraudulent acts of said [d]efendants."  The state trial court's order is unclear as to the basis of its ruling against [the debtor].  We cannot determine decisively from the state trial court's contradictory findings that its decision was based on a finding of fraud.  Accordingly, we affirm the bankruptcy court's refusal to apply the doctrine of collateral estoppel to [the plaintiff]'s § 523(a)(2)(A) claim.

Id. at *6.

Because the Arbitration Award at issue in this adversary proceeding was confirmed by the Judgment of a Michigan state court, this Court must look to Michigan law to determine what preclusive effect Michigan courts would give to a judgment confirming an arbitration award in a subsequent action between the same parties.  In re Bursack, 65 F.3d at 53 ("'[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'") (quoting Migra v. Warren City Sch. Dist. Bd. of Ed., 465 U.S. 75, 81 (1984)) (other citation omitted).  The Court of Appeals for the Sixth Circuit has summarized Michigan law on collateral estoppel as follows:

> Under Michigan law, collateral estoppel applies when "1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first

-15-

proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding."

Hinchman v. Moore, 312 F.3d 198, 202 (6th Cir. 2002) (quoting Darrah v. City of Oak Park, 255 F.3d 301, 311 (6th Cir. 2001) (citing People v. Gates, 452 N.W.2d 627, 630-31 (1990))).

Michigan courts have explained the purpose of collateral estoppel principles in Michigan as follows: "The doctrine of collateral estoppel must be applied so as to strike a balance between the need to eliminate repetitious and needless litigation and the interest in affording litigants a full and fair adjudication of the issues involved in their claims." Storey v. Meijer, Inc., 429 N.W.2d 169, 171 (Mich. 1988) (citation omitted). In Michigan, the doctrine of collateral estoppel acts "to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication . . . ." Monat v. State Farm Insurance Co., 677 N.W.2d 843, 851 (Mich. 2004) (internal quotation marks and citations omitted). However, Michigan courts also explain that "[c]ollateral estoppel applies only where the basis of the prior judgment can be ascertained clearly, definitely, and unequivocally." People v. Gates, 452 N.W.2d 627, 631 (Mich. 1990) (citing Dowling v. United States, 493 U.S. 342 (1990) and Sealfon v. United States, 332 U.S. 575 (1948)). In Michigan, to determine whether collateral estoppel principles apply in a given case, "[w]e look beyond the pleadings to consider both the 'factual focus' of the prior proceedings and 'whether the party against whom collateral estoppel is asserted has had a full and fair opportunity to litigate the issue.'" Livingston v. Transnation Title Insurance Co. (In re Livingston), No. 08-1539, 2010 WL 1404530, at *3 (6th Cir. Apr. 9, 2010) (quoting People v. Gates, 452 N.W.2d at 631).

The fact that the Judgment in the State Court Lawsuit confirmed the Arbitration Award does not vary the application of these principles. Michigan courts have squarely held that collateral

-16-

estoppel principles apply to factual findings made during an arbitration proceeding. In <u>Cole v. West Side Auto Employees Federal Credit Union</u>, 583 N.W.2d 226 (Mich. Ct. App. 1998), an appellate panel held that "factual findings made by an arbitrator after a proper arbitration proceeding are conclusive in a later-filed civil suit between the same parties . . . ." <u>Id.</u> at 229-30 (citing <u>Porter v. Royal Oak</u>, 542 N.W.2d 905, 908 (Mich. Ct. App. 1995) (explaining that collateral estoppel principles apply "to factual determinations made during . . . arbitration proceedings")).[5]

When the Court lifted the automatic stay on August 25, 2010, it permitted the arbitration to go forward to determine whether there is a debt owing by the Debtor to Tweedie and, if so, the amount of that debt. The Arbitration Award did that. Although the Court clearly stated that the determination of whether there is a non-dischargeable debt will be made solely by this Court, and not by the Arbitrator, this Court is nevertheless bound to accept the fact findings made in the Arbitration Award to the same extent that a state court in Michigan must do so. The issue then is whether all of the elements of collateral estoppel are present in this case with respect to the Arbitration Award. As the party asserting the preclusive effect of the Arbitration Award, Tweedie has the burden of proof on all elements of collateral estoppel. <u>United States v. Dominguez</u>, 359 F.3d 839, 842 (6th Cir. 2004) ("Under Michigan law, the party asserting preclusion bears the burden of proof.") (citing <u>Detroit v. Qualls</u>, 454 N.W.2d 374, 383 (Mich. 1990)).

There is no question that two of the four requirements of collateral estoppel are present in this case. The parties to this adversary proceeding, the Debtor and Tweedie, are the same parties

---

[5] Like Michigan law, federal law also gives "collateral estoppel effect to issues actually litigated in an arbitration proceeding between the same parties . . . ." <u>Central Transport, Inc. v. Four Phase Systems, Inc.</u>, 936 F.2d 256, 260 (6th Cir. 1991) (affirming the district court's grant of summary judgment to defendants because the factual basis for plaintiffs' claims was decided in arbitration in the defendants' favor).

-17-

to the State Court Lawsuit. That satisfies the first requirement. The Arbitration Award and the Judgment of the Antrim County Circuit Court confirming it constitute a valid, final judgment. That satisfies the second requirement. The application of collateral estoppel principles in this case will turn on the remaining two requirements of collateral estoppel: (i) whether the facts to support each element of a non-dischargeable debt under § 523(a)(2)(A), (4), or (6) of the Bankruptcy Code were both actually litigated in the arbitration and necessarily determined by the Arbitration Award; and (ii) whether the Debtor has had a full and fair opportunity to litigate such issues.

In Michigan, an issue has been actually litigated only if it has been "put into issue by the pleadings, submitted to the trier of fact for a determination, and thereafter determined." VanDeventer v. Michigan National Bank, 432 N.W.2d 338, 341 (Mich. Ct. App. 1988) (citation omitted). Michigan courts further instruct that an "issue must be identical to that determined in the prior action" to have been actually litigated. Amalgamated Transit Union, Local 1564, AFL-CIO v. S.E. Michigan Transp. Auth., 473 N.W.2d 249, 253-54 (Mich. 1991) (citation omitted). "This doctrine is strictly applied in that the issues in both cases must be identical, and not merely similar . . . ." Keywall & Rosenfeld v. Bithell, 657 N.W.2d 759, 782 (Mich. Ct. App. 2002) (brackets, quotation marks and citation omitted). Under Michigan law, "[a]n issue is necessarily determined only if it is 'essential' to the judgment." People v. Gates, 452 N.W.2d at 631 (citation omitted).

The Michigan Supreme Court instructs "courts [to] look to the factors set forth in 1 *Restatement Judgments*, 2d, ch. 3, Former Adjudication, §§ 28-29" when determining whether a party has had a full and fair opportunity to litigate an issue. Monat v. State Farm Ins. Co., 677 N.W.2d at 845-46 n.2 (quoting §§ 28 and 29). The Monat court applied § 28(1), where "'[t]he party against whom preclusion is sought could not as a matter of law, have obtained review of the

-18-

judgment in the initial action[.]'" Id. at 847. Other examples in the *Restatement* include a new determination being warranted where the "issue is one of law and [ ] the two actions involve claims that are substantially unrelated," or where there are "differences in the quality or extensiveness of the procedures followed in the two courts." Id. at 845-46 n.2 (quoting § 28(2), (3)).

To resolve these pivotal issues, the Court must identify the elements of a non-dischargeable debt under § 523(a)(2)(A), (4), and (6) of the Bankruptcy Code, then examine the State Court Complaint and the Arbitration Award to determine if the facts demonstrating those elements were both actually litigated and necessarily determined by the Arbitration Award, and determine whether the Debtor had a full and fair opportunity to litigate those issues in the State Court Lawsuit.

### Section 523(a)(2)(A) of the Bankruptcy Code

Count I of Tweedie's complaint in this adversary proceeding seeks a determination of non-dischargeability under § 523(a)(2)(A) of the Bankruptcy Code. There are three types of conduct described in §523(a)(2)(A) that can give rise to a non-dischargeable debt: (1) false pretenses; (2) a false representation; and (3) actual fraud.

> Each of the three grounds for nondischargeability set forth in § 523(a)(2)(A) are independent. . . . But regardless of their individual differences, each of the three grounds . . . overlap, and are intended to serve the same goal: to guard against dishonesty, by denying the fresh-start policy of the Bankruptcy Code to a debtor who never had any intention of repaying their obligation. To this end, each of the grounds require a showing of positive fraud; as opposed to fraud implied in law.

Adam v. Fletcher (In re Fletcher), 345 B.R. 593, 597 (Bankr. N.D. Ohio 2006) (citations omitted)

Count I of Tweedie's complaint in this adversary proceeding is titled "Fraud," but paragraph 20 of the complaint makes it clear that Tweedie alleges that the Debtor obtained money from him by means of all three types of conduct: false pretenses, false representations and actual fraud. However, most of Count I is based on false representations. Paragraph 21 of Tweedie's

-19-

complaint lists 17 separate false representations made by the Debtor. Count I alleges that the 17 misrepresentations were made with intent to deceive Tweedie, and that the Debtor failed to disclose that these misrepresentations were not truthful. But the complaint does not allege any specific conduct that constitutes either false pretenses or actual fraud, other than the 17 misrepresentations. Therefore, even though Count I of the complaint seeks a determination of non-dischargeability based on false pretenses, false representations and actual fraud, the Court will first consider the allegations of false representations since that is the primary, if not the entire, basis for Tweedie's request for relief under § 523(a)(2)(A) of the Bankruptcy Code.

Misrepresentation

In order to prevail under § 523(a)(2)(A) of the Bankruptcy Code based on a misrepresentation, a creditor must prove the following elements by a preponderance of the evidence:

(1) the debtor obtained money, property, services, or credit;

(2) through a material misrepresentation;

(3) that, at the time, the debtor knew was false or made with gross recklessness as to its truth;

(4) the debtor intended to deceive the creditor;

(5) the creditor justifiably relied on the false representation; and

(6) its reliance was the proximate cause of loss.

Rembert v. AT & T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 280-81 (6th Cir. 1998) (citation omitted).

Paragraphs 19 through 22 of Tweedie's complaint in this adversary proceeding all allege that the Debtor obtained money from Tweedie, consisting of the loans that Tweedie borrowed from Alden State Bank. The State Court Complaint filed in the State Court Lawsuit alleged in

-20-

paragraph 14 that Tweedie "turned over" to the Debtor more than $300,000.00 of loan proceeds that Tweedie had borrowed from Alden State Bank. That allegation put in issue in the State Court Lawsuit the first element under § 523(a)(2)(A): that the Debtor obtained money from Tweedie.[6]

The next question is whether this issue was submitted to the trier of fact and thereafter determined. The trier of fact was the Arbitrator, who memorialized his findings in the Arbitration Award. Although the Arbitration Award contains numerous findings, many of them are imprecise and confusing. However, the Arbitration Award did specifically find that the Debtor obtained money from Tweedie. Finding of fact no. 12 in the Arbitration Award states that Tweedie advanced $100,000.00 to the Debtor on November 11, 2005. Finding of fact no. 16 states that Tweedie advanced $50,000.00 to the Debtor in December, 2005. Finding of fact no. 24 states that Tweedie advanced $133,297.58 to the Debtor on May 1, 2006. Finding of fact no. 30 states that Tweedie advanced $10,000.00 to the Debtor on July 20, 2006. Finding of fact nos. 35 and 36 state that Tweedie advanced $20,000.00 to the Debtor on September 19, 2007. Finding of fact no. 40 states that Tweedie advanced $50,000.00 to the Debtor on October 8, 2007. Finding of fact no. 44 states that Tweedie advanced $15,000.00 to Tropical Breeze, Inc., one of the Debtor's Companies, in November, 2007. The Arbitration Award's findings establishing the amount of money that the Debtor obtained from Tweedie are clear, definite and unequivocal. They establish that the Debtor obtained $378,297.58 from Tweedie. This issue was actually litigated.

---

[6] In paragraphs 53(b) and 66(b), the State Court Complaint also alleged that Tweedie provided over 1000 hours of services to the Debtor. However, Tweedie's complaint in this adversary proceeding makes no allegations about such services and does not seek a non-dischargeable debt based upon the value of such services. Instead, Tweedie's complaint in this adversary proceeding is based upon the *money* obtained by the Debtor from Tweedie.

-21-

The last question in applying this requirement of collateral estoppel to the first element of a § 523(a)(2)(A) action for misrepresentation is whether the issue was necessarily determined, i.e. essential to the judgment. The Arbitration Award includes as one of the components in the "Damage Description" the unpaid balance of $310,987.00 that Tweedie owes to Alden State Bank, which loaned the money to Tweedie to make the advances to the Debtor. The Arbitration Award's findings regarding the amount of funds obtained by the Debtor from Tweedie are essential to the Arbitration Award's conclusion that the Debtor is liable to repay Tweedie the unpaid balance that he owes to Alden State Bank. The Arbitration Award's findings satisfy the first element under § 523(a)(2)(A) of the Bankruptcy Code as to the funds advanced by Tweedie.

The second element of a § 523(a)(2)(A) action for misrepresentation is a showing that the Debtor obtained the money from Tweedie through a material misrepresentation. Tweedie's complaint in this adversary proceeding alleges in paragraph 21 that the Debtor made 17 different misrepresentations to Tweedie. These misrepresentations included statements about: how much money the Debtor had invested in the juice business; the Debtor's intention to make Tweedie a partner in the juice business; the size of the return Tweedie would receive on his advances; the Debtor's intention to pay Tweedie a share of the profits; the extent of Tweedie's ownership interest in the juice business; the Debtor's intention to send tax returns, financial statements and other financial information to Alden State Bank; the Debtor's intention to use the money advanced by Tweedie solely for the ordinary and necessary expenses of the juice business; the Debtor's intention to keep Tweedie fully informed of the affairs of the juice business; the Debtor's intention to repay Tweedie before paying "others"; the Debtor's intention to pay Alden State Bank even if it meant he had to "cash in his mother's annuities"; the Debtor's intention to pay Alden State Bank timely; that

-22-

Tweedie was entitled to a senior perfected security interest in certain assets; the Debtor's intention to provide medical and life insurance for Tweedie until "the loans were repaid"; and that the Debtor had used funds from his mother to purchase a boat. Paragraph 15 of the State Court Complaint also alleged these very same false statements. Clearly, the State Court Complaint did put in issue and submit to the Arbitrator the identical issue of whether the Debtor made misrepresentations to Tweedie. But it is not nearly as easy to ascertain specifically what the Arbitrator found was misrepresented and whether the Arbitrator's findings of misrepresentation were essential to the Arbitration Award.

The Arbitration Award is replete with findings of misrepresentation by the Debtor. Unfortunately, many of the findings regarding misrepresentations are not specific, but instead refer generally to "the aforesaid misrepresentations," without describing the actual misrepresentations with particularity. The only way for this Court to determine whether the Arbitration Award determined that the Debtor obtained the advances of funds from Tweedie through a material misrepresentation is to review each specific finding of fact regarding each of the advances made by Tweedie and each specific finding of fact regarding the representations that were made to obtain each of those specific advances.

Finding of fact no. 8 states that the Debtor misrepresented to Tweedie that he "owned 100% of ACVS and ABF." Finding of fact no. 9 states that the Debtor did not disclose the "facts" that he only owned 85% of "AVCS" (i.e., AIM Vending & Coffee Service, Inc.) and only owned 42% of "ABF" (i.e., AIM Breeze Freeze). Finding of fact no. 10 does not use the word misrepresentation, but instead states that the Debtor, knowing that Tweedie would have to borrow funds from Alden State Bank, promised Tweedie that he would repay the bank timely, pay Tweedie a

-23-

$100,000.00 bonus, and that Tweedie would have priority over all other creditors. Finding of fact nos. 13 through 18, although not using the word misrepresentation or identifying any specific misrepresentations, found that the money advanced by Tweedie in October and December, 2005 was deposited in AIM Vending & Coffee Service, Inc.'s bank account, was used to pay bills out of that company, and was not entirely used for the purchase of two Breeze Freeze franchises. Finding of fact no. 20 states that the Debtor misrepresented to Tweedie the amount of his own funds that he put into "the business." That same finding of fact states that the Debtor misrepresented to Tweedie that he would timely make all of Tweedie's payments to Alden State Bank directly, furnish financial information to Alden State Bank, and that Tweedie would be "paid first." Finding of fact no. 21 states that the Debtor misrepresented to Tweedie that the Debtor "intended that Tweedie own 49% of the Breeze Freeze franchised business and that supporting financials would be provided" to Alden State Bank. Finding of fact no. 28 repeats the misrepresentations that are covered in finding of fact no. 20. Finding of fact no. 32 states that the Debtor misrepresented how he used $10,000.00 advanced by Tweedie. Finding of fact no. 34 repeats the same misrepresentations as in finding of fact nos. 20 and 28 only at a later date in September, 2007. Finding of fact no. 37 states that the Debtor misrepresented how he used another $20,000.00 advanced by Tweedie. Finding of fact no. 43 repeats the same misrepresentations as in finding of fact nos. 20, 28 and 34, except that the Debtor made the statements in November, 2007. Finding of fact no. 44 refers to "the aforesaid misrepresentations." Finding of fact no. 45 states that the Debtor misrepresented to Tweedie that the funds advanced by Tweedie had been used solely to purchase juice for the juice business. Finding of fact no. 49 states that the Debtor misrepresented to Tweedie that "ABF was profitable and that all its profits were being reinvested in its business." Finding of fact no. 50 states that the

-24-

Debtor misrepresented to Tweedie that the Debtor and Tweedie were partners. Finding of fact no. 53 states that the Debtor misrepresented to Tweedie that "TB was TP's distributor and profitable as such." At the end of the findings of fact, conclusion of law no. 2 states that "the misrepresentations" were made by the Debtor "in order to obtain funds from Tweedie." Conclusions of law no. 7 and 8 also state that the Debtor made misrepresentations to Tweedie but does not state with particularity what those misrepresentations were.

The Arbitration Award is difficult to read, and in many places repetitive, inconsistent and confusing about what the Arbitrator is referring to with the phrase "the aforesaid misrepresentations." The Court does not make this observation to be critical, but instead to point out the difficulties in trying to ascertain exactly what were the false statements or misrepresentations that the Arbitrator found the Debtor to have made, and then applying to them the exacting standard that collateral estoppel demands. It is no easy task. However, after parsing through each and every finding of fact set forth in the Arbitration Award, and disregarding those findings of fact that are internally inconsistent, unclear, indefinite, equivocal, or that are just made up of mere promises of future performance, or statements concerning the financial condition of the Debtor or an insider of the Debtor,[7] the Court is convinced that the Arbitrator did determine that the Debtor made material misrepresentations to Tweedie to induce him to advance funds to the Debtor. Those misrepresentations are set forth in finding of fact nos. 10, 15, 18, 20, 21, 28, 32, 34, 37, 39, 43, 45, and 50. Even though the Arbitration Award may not always have used the specific word

---

[7] Subsections (A) and (B) of § 523(a)(2) are mutually exclusive. Both oral and written statements regarding a debtor's or insider's financial condition are excluded from subsection (A) but such statements are actionable under subsection (B) if in writing. Prim Capital Corp. v. May (In re May), 368 B.R. 85 (Table), 2007 WL 2052185, at *5 (B.A.P. 6th Cir. July 19, 2007).

*misrepresentation*, each of these findings does identify one or more false statements made by the Debtor to Tweedie. The Debtor misrepresented his ownership interests in AIM Vending & Coffee Service, Inc. and in the juice business. The Debtor misrepresented what Tweedie's advances would be used for and how they were in fact used by the Debtor. The Debtor misrepresented the amount of his own funds that he put in the juice business. The Debtor misrepresented the position and ownership interest that Tweedie held in the juice business. The Debtor misrepresented that profits of the business were being reinvested. The Debtor misrepresented that he and Tweedie were partners.

The question of whether the Debtor made material misrepresentations to Tweedie was put in issue by Tweedie's State Court Complaint. The findings of false statements were essential to the Arbitration Award. Conclusion of law no. 2 states that the Debtor made the misrepresentations to Tweedie in order to deceive Tweedie and to obtain the funds. Conclusion of law no. 7 states that the money advanced by Tweedie to the Debtor was obtained by false representations. This issue was both actually litigated and necessarily determined in the arbitration. The Court is bound by the Arbitration Award's findings on this issue. The Arbitration Award establishes the second element of § 523(a)(2)(A), that the money obtained by the Debtor from Tweedie (i.e., $378,297.58) was obtained through material misrepresentations.

The third element of a § 523(a)(2)(A) action for misrepresentation is that the Debtor knew that the misrepresentation was false or that it was made recklessly as to its truth. Paragraph 22 of Tweedie's complaint in this adversary proceeding alleges this element. Paragraph 79 of the State Court Complaint also alleged that the Debtor made the misrepresentations knowing that they were false. That allegation is sufficient to put the identical issue before the trier of fact in the State Court

Lawsuit. Finding of fact nos. 29 and 67 in the Arbitration Award state that the Debtor knew that the misrepresentations he made to Tweedie were false when made. Conclusion of law no. 2 in the Arbitration Award also states that the Debtor knew that the misrepresentations he made to Tweedie were false when he made them, or that they were made recklessly without regard to their truth or falsity. This issue was both actually litigated and necessarily determined in the arbitration. The Arbitration Award's findings on this issue are definite, clear and unequivocal. The Debtor knew that the misrepresentations he made to Tweedie were false at the time he made them. Based upon those findings of fact and conclusions of law in the Arbitration Award, the third element of a § 523(a)(2)(A) action is met in this case.

The fourth element of a § 523(a)(2)(A) action for misrepresentation is that the Debtor must have intended to deceive Tweedie. Paragraphs 22, 24, and 25 of Tweedie's complaint in this adversary proceeding allege this element. Paragraphs 76, 77 and 79 of the State Court Complaint all alleged that the Debtor made misrepresentations to Tweedie with the intent to deceive him. That is sufficient to put this element before the trier of fact in the State Court Lawsuit. Finding of fact no. 29 in the Arbitration Award states that the Debtor made the misrepresentations to Tweedie with the intent to mislead and deceive Tweedie. Finding of fact no. 67 also supports a finding that the Debtor intended to deceive Tweedie. Conclusion of law no. 2 also states that the Debtor intended to deceive Tweedie. This issue was both actually litigated and necessarily determined. The findings of fact and conclusions of law regarding the Debtor's intent to deceive Tweedie are definite, clear and unequivocal. They establish the requisite intent to deceive under § 523(a)(2)(A) of the Bankruptcy Code.

The fifth element of a § 523(a)(2)(A) action for misrepresentation is that the creditor justifiably relied upon the false representation made by the debtor. This element has two components. First, there must be a demonstration that the creditor actually relied on the false representation and, second, there must be a demonstration that such reliance was justifiable. Paragraph 26 of Tweedie's complaint in this adversary proceeding alleges that Tweedie "reasonably and detrimentally relied" upon the Debtor's misrepresentations. Paragraph 78 of the State Court Complaint also alleged that Tweedie relied on the Debtor's misrepresentations and that such reliance was reasonable. These allegations are sufficient to put reliance before the trier of fact in the State Court Lawsuit. The Arbitration Award contains a number of findings of fact establishing that Tweedie actually relied on misrepresentations made by the Debtor. Finding of fact nos. 12, 21, 24, 27, 30, 33, 35, 40, 44, and 54 all state that Tweedie relied upon the misrepresentations made by the Debtor. The Arbitration Award does not expressly state that there was *actual* reliance by Tweedie on the Debtor's misrepresentations, but its findings of fact are sufficient to demonstrate that the issue of actual reliance was both actually litigated and necessarily determined. The findings of fact on this issue are definite, clear and unequivocal.

The more difficult question concerns the second component of reliance under § 523(a)(2)(A): whether Tweedie's reliance was justifiable. In <u>Field v. Mans</u>, 516 U.S. 59 (1995), the United States Supreme Court explained the concept of justifiable reliance.

> [A] person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation. . . . [A]lthough the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. Justifiability is not without some limits, however. . . . [A] person is required to use his senses, and cannot recover if

he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. . . .

. . . [I]t is only where, under the circumstances, the facts would be apparent to one of [the plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.

Id. at 70-71 (internal quotation marks and citations omitted).

The State Court Complaint did not expressly allege that Tweedie's reliance on the Debtor's misrepresentations was *justifiable,* but it did allege a number of facts in paragraph 8 about the relationship between the Debtor and Tweedie that, in combination, are reasonably construed as at least implicitly alleging that any reliance by Tweedie on the Debtor was justifiable in light of their long personal relationship.  The State Court Complaint alleged that the Debtor and Tweedie were close personal friends since their childhood, covering about 50 years, that they had socialized and done business together over those years and that, because of these relationships, Tweedie placed great confidence and trust in the Debtor.  The Court is persuaded that the question of whether Tweedie's reliance was justifiable was put in issue in the State Court Lawsuit.

While there are many findings of fact in the Arbitration Award that state that Tweedie reasonably relied upon the misrepresentations made by the Debtor, none of them expressly state that such reliance was justifiable.  However, there are multiple findings of fact that describe the quality and characteristics of Tweedie, his relationship to the Debtor, and the circumstances of his reliance, that assist the Court in determining whether the Arbitration Award establishes that Tweedie's reliance upon the Debtor's misrepresentations was justifiable.  Finding of fact no. 1 describes the childhood friendship between the Debtor and Tweedie and the trust that Tweedie had in the Debtor.  Finding of fact no. 6 describes a previous loan that Tweedie had made to Hermoyian that was

promptly repaid. Finding of fact nos. 40, 44 and 54 all state that Tweedie's reliance on the Debtor's misrepresentations was reasonable.[8] Finding of fact no. 67 states that the Debtor used his personal lifelong relationship with Tweedie to have Tweedie advance money to the Debtor. These findings of fact, taken together, establish that Tweedie's reliance upon the Debtor's misrepresentations was justifiable in the circumstances of this case. This issue was both actually litigated and necessarily determined. These findings of fact are clear, definite and unequivocal, and demonstrate that this element of § 523(a)(2)(A) of the Bankruptcy Code is met.

The sixth and final element of an action for misrepresentation under § 523(a)(2)(A) is that the creditor's reliance upon the material misrepresentation must be the proximate cause of the creditor's loss. The Sixth Circuit Court of Appeals consistently holds that proximate cause is a necessary element of a creditor's non-dischargeability action under § 523(a)(2)(A). Rembert v. AT & T Universal Card Services, Inc., (In re Rembert), 141 F.3d 277, 280-81 (6th Cir. 1998) (citing Logan v. McLaren (In re McLaren), 3 F.3d 958, 961 (6th Cir. 1993)); Mohamed A. Atassi, M.D., Inc. v. McLaren (In re McLaren), 990 F.2d 850, 852 (6th Cir. 1993) (citation omitted). The Sixth Circuit, however, has not elaborated on the meaning or requirements of proximate cause under § 523(a)(2)(A).

Bankruptcy courts within the Sixth Circuit have explained the concept of proximate cause differently. In WebMD Practice Services, Inc. v. Sedlacek (In re Sedlacek), 327 B.R. 872 (Bankr. E.D. Tenn. 2005), the court stated that a "[p]laintiff must prove that its reliance on the [d]ebtor's

---

[8] "The element of 'justifiable' reliance . . . is a less demanding requirement than 'reasonable' reliance . . . ." McCallum v. Pixley (In re Pixley), 456 B.R. 770, 782 (Bankr. E.D. Mich. 2011) (citation omitted). The Arbitration Award determined that Tweedie had met the higher standard.

representations was the proximate cause of its losses, which depends on whether the [debtor's] conduct has been so significant and important a cause that the [debtor] should be legally responsible." Id. at 888 (internal quotation marks and citations omitted). The Sedlacek court further noted that "[t]here must be a direct link between the alleged fraud and the creation of the debt." Id. (internal quotation marks and citation omitted). In Wings & Rings, Inc. v. Hoover (In re Hoover), 232 B.R. 695 (Bankr. S.D. Ohio 1999), the court stated that "[p]roximate cause is established where the misrepresentation is a substantial factor in the loss and where the loss may be reasonably expected to result from reliance." Id. at 700 (citation omitted). These decisions provide useful, yet incomplete, explanations of proximate cause.

A more comprehensive discussion of the proximate cause element of § 523(a)(2)(A) is contained in Gem Ravioli, Inc. v. Creta (In re Creta), 271 B.R. 214 (B.A.P. 1st Cir. 2002). Pursuing the same analytical process engaged in by the U.S. Supreme Court in Field v. Mans, the First Circuit Bankruptcy Appellate Panel in Creta looked to the *Restatement* (*Second*) *of Torts* (1976) to ascertain the meaning of proximate cause under § 523(a)(2)(A). 271 B.R. at 218-19 (citing Field v. Mans, 516 U.S. at 61, 68-70) (reasoning that the *Restatement* (*Second*) *of Torts* (1976) was the best source to use for its statutory analysis of common law terms expressly stated in § 523(a)(2)(A) because it was "the most widely accepted distillation of the common law of torts" in existence at the time Congress passed the Bankruptcy Act). As explained by the Creta panel, in the *Restatement* (*Second*) *of Torts*, "proximate causation encompasses two elements, 'causation in fact' and 'legal causation.' 'Causation in fact' requires that a debtor's misrepresentations be a 'substantial factor in determining the course of conduct that results in [the] loss.'" In re Creta, 271 B.R. at 219 (quoting *Restatement* §§ 546 and 548A) (other citation omitted).

"[Causation in fact] is concerned with the question of whether the misrepresentation by the defendant has caused the plaintiff's loss at all.

"If the misrepresentation has in fact induced the recipient to enter into the transaction, there is causation in fact of the loss suffered in the transaction . . . .

"For the misrepresentation to be a cause in fact of the pecuniary loss that results from the plaintiff's action or inaction, the plaintiff must have relied upon the misrepresentation in incurring the loss. It is not, however, necessary that his reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision."

Id. (quoting *Restatement* § 546 comments a and b).

"'Legal causation' requires that a creditor's loss 'reasonably be expected to result from the reliance.'" Id. (quoting *Restatement* § 548A).

"In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates. . . .

"Pecuniary losses that could not reasonably be expected to result from the misrepresentation are, in general, not legally caused by it and are beyond the scope of the maker's liability. This means that the matter misrepresented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow . . . .

"In determining what is foreseeable as a result of the misrepresentation, the possibility of intervening events is not to be excluded altogether."

Id. (quoting *Restatement* § 548A comments a and b); see also Sharfarz v. Goguen (In re Goguen),

453 B.R. 452, 457-59 (B.A.P. 1st Cir. 2011) (reversing bankruptcy court's determination of

nondischargeable debt under § 523(a)(2)(A) due to its failure to properly apply the proximate cause

standard enunciated in In re Creta); Hernandez v. Musgrave (In re Musgrave), BAP Nos. CO-10-

049, 08-25165, 2011 WL 312883, at *9-*11 (B.A.P. 10th Cir. Feb. 2, 2011) (applying proximate

cause standard enunciated in In re Creta to reverse in part bankruptcy court's determination on

amount of damages proximately caused by debtor's fraud and deemed to be nondischargeable under § 523(a)(2)(A)).

Tweedie's complaint in this adversary proceeding does not expressly allege that Tweedie suffered a loss that was the proximate result of his reliance upon the Debtor's misrepresentations. However, paragraph 27 of Tweedie's complaint in this adversary proceeding does allege that "because . . . the Debtor obtained money from Plaintiff . . . through the use of false representations . . . ," the Debtor owes a non-dischargeable debt to Tweedie under § 523(a)(2)(A) of the Bankruptcy Code. In substance, if not in name, this paragraph alleges proximate cause. Paragraphs 80 and 87 of the State Court Complaint alleged that Tweedie suffered damages as a proximate result of the Debtor's misrepresentations to Tweedie. This element was put in issue in the State Court Lawsuit. But what was determined by the Arbitrator? Was the entire amount of the Arbitration Award found to be a loss resulting from Tweedie's reliance on the Debtor's misrepresentations? Or was the loss that was proximately caused by Tweedie's reliance on the misrepresentations found to be just the amount of the advances that Tweedie made to the Debtor, less any amounts of those advances that the Debtor repaid?

The Arbitration Award includes one section entitled "Damages" and another section entitled "Damage Description." The section entitled "Damages" does not itemize Tweedie's damages. Instead, it discusses Michigan statutory and common law regarding treble damages, exemplary damages and attorney fees. In contrast, the "Damage Description" section contains 11 separate items of damage. The first item in the "Damage Description" is $310,987.00, which is described as "Debt to Alden State Bank for loans for Hermoyian, et al ($295,390.00 as of 1-4-10 plus interest @ 8% to August 31, 2010[)]." That is the outstanding unpaid balance of the loans that Tweedie

-33-

borrowed from Alden State Bank to advance to the Debtor based upon Tweedie's reliance on the Debtor's misrepresentations.

In addition to the debt that Tweedie owes to Alden State Bank, the Arbitration Award identifies in the "Damage Description" the following 10 separate items of damages:

| | |
|---|---:|
| Unpaid Bonus | 100,000.00 |
| Loss of business value $2,000,000.00 (as per Hermoyian as of 7/08) X 49% | 980,000.00 |
| Monthly payments to Alden State Bank by Tweedie on 11/05 for $145,000.00 loan | 4,747.00 |
| Payments to Alden State Bank after !!-1-08 [sic] to reduce debt on loans obtained for Hermoyian, et al | 70,296.90 |
| Unpaid Insurance Premiums - Health & Life | 26,970.00 |
| Lost value of loan collateral to Alden State Bank | 75,600.00 |
| Compensation Lost | 136,250.00 |
| Van expense | 33,455.00 |
| F-350 Truck Expense | 21,999.00 |
| Home Foreclosure Loss | 339,456.00 |

The Arbitration Award added the "Unpaid Bonus" and "Loss of business value" to the $310,987 that Tweedie still owes to Alden State Bank, and described them as "Actual Damages." The Arbitration Award then trebled this amount, added the other eight items and described them as "Additional Damages," totaling $708,773.90, and finally added $561,111.57 of "Attorney Fees and Costs," for a "Total Monetary Award" of $5,442,846.47.

Considering that the Arbitrator found the total of all of the money that Tweedie ever advanced to the Debtor or the Debtor's Companies was $378,297.58, the Court is immediately

-34-

struck by the enormity of the Arbitration Award of $5,442,846.47.  As noted earlier, the purpose of proceeding with the arbitration that the parties had bargained for was to determine whether there is a debt and, if so, the amount of that debt.  The Arbitration Award answered these questions.  But did the Arbitration Award actually find that this staggering sum is a loss that was proximately caused by Tweedie's reliance on the Debtor's misrepresentations?  The answer is no.

Finding of fact nos. 12, 16, 24, 30, 35, 36, 40 and 44 all state that Tweedie advanced funds to the Debtor.  Finding of fact nos. 12, 21, 24, 33, 35, 40 and 44 clearly state that these advances were made *because of* Tweedie's reliance on material misrepresentations made by the Debtor.  The Court has no difficulty concluding that the Arbitrator found that *this amount* of Tweedie's loss was proximately caused by Tweedie's reliance on the Debtor's misrepresentations.  The Debtor's misrepresentations were the cause in fact for Tweedie to make these advances to the Debtor.  Moreover, that Tweedie would have to repay Alden State Bank the funds he borrowed from it to advance those funds to the Debtor was a foreseeable result of the Debtor's misrepresentations.  The Debtor's misrepresentations proximately caused the loss that Tweedie suffered by borrowing funds from Alden State Bank to advance to the Debtor.  This issue was both actually litigated and necessarily determined by the Arbitration Award.  The Arbitration Award's findings on this part of Tweedie's loss are clear, definite and unequivocal, and demonstrate that this part of Tweedie's loss was proximately caused by Tweedie's reliance on the Debtor's misrepresentations.  However, the same cannot be said about the balance of the Arbitration Award.

There are only two other places in the Arbitration Award that addressed at all the issue of the proximate cause of Tweedie's loss.  The first of them is finding of fact no. 63.  It states as follows:

-35-

Tweedie has been damaged as a direct and proximate result of Hermoyian's and Semeniuk's conduct in that the mortgage on his home was foreclosed; has lost work due to the notice of foreclosure being posted in the local newspaper(s); unable to fulfill his long term plan and promise to pay for his grandchildren's college education; has been forced to sell nearly all his assets including motorcycle, airplane, Kubota tractor and even garden tools, all in addition to the severe anxiety and mental suffering which necessitated medical treatment.

The second place is in conclusion of law no. 13. It states as follows:

As a direct and proximate result of the acts and/or omissions committed by Michael Hermoyian and Betty Semeniuk, Third Party John Tweedie has been damaged and will continue to be damaged including loss of money, property, reputation and credit worthiness.

Finding of fact no. 63 states that Tweedie was damaged by the "conduct" of the Debtor and Semeniuk. But what conduct? Conclusion of law no. 13 states that Tweedie was damaged by the "acts and/or omissions" of the Debtor and Semeniuk. But what acts and what omissions? The State Court Complaint contained 17 separate counts each describing multiple acts, omissions and conduct by the Debtor, Semeniuk and the Debtor's Companies. Counts VII through XVII were arbitrated. Count VII asserted breaches of common law fiduciary duties. Count VIII asserted breaches of statutory fiduciary duties. Count IX asserted breaches of more statutory fiduciary duties. Count X asserted de facto and de jure partnerships and breaches of statutory partnership duties. Count XI asserted misrepresentations. Count XII asserted failure to disclose information. Count XIII asserted false promises. Count XIV asserted conversion of Tweedie's property rights. Count XV asserted conspiracy. Count XVI sought a declaratory ruling on Tweedie's ownership interest in the Debtor's Companies. Count XVII sought the imposition of a constructive trust based on conversion of tangible and intangible property. The State Court Complaint put in issue many types of conduct by the Debtor, Semeniuk, and the Debtor's Companies taking place over a number of years.

-36-

The Arbitration Award is full of findings of fact regarding specific acts and aspects of the conduct of the Debtor's Companies, Semeniuk and the Debtor over several years. Many of these findings of fact describe acts and conduct that relate to various counts in the State Court Complaint, but are not based upon Tweedie's reliance on the misrepresentations that the Debtor made to obtain advances of funds from Tweedie. For example, the Arbitration Award has an entire section in the findings of fact entitled "The Business Ledgers" that contains many findings of fact regarding how the Debtor's Companies transacted business. But there is no finding of fact that Tweedie ever asked to look at, or in fact ever looked at, any of the business ledgers or relied upon them in any way when he made his advances of funds to the Debtor or, for that matter, at any time ever. Similarly, there is a section of the findings of fact entitled "Corporations." Many of these findings of fact relate to the manner in which the Debtor's Companies created and maintained organizational documents. For example, finding of fact no. 67 states that the "wished for distinctions of the various corporations" were illusory. Similarly, finding of fact no. 76 states that the Debtor's Companies did not observe "corporate formalities." Finding of fact no. 79 states that the Debtor's Companies used "confusingly similar names." Finding of fact no. 80 states that certain of the Debtor's Companies did not file their own tax returns.

Still other findings of fact relate to personal expenses of the Debtor. Finding of fact no. 85 states that Semeniuk issued checks from her personal bank account to pay for an attorney for the Debtor only. Finding of fact no. 86 states that some of the Debtor's Companies paid for clothing and hair salons and other personal expenditures of the Debtor and Semeniuk. Finding of fact no. 87 states that AIM Vending & Coffee Service, Inc. paid for Semeniuk to visit her friend in South Carolina. Finding of fact no. 94 describes Semeniuk's testimony in detail regarding services that

she provided for the Debtor's Companies. Finding of fact no. 96 describes how the Debtor had testified about the manner in which Tweedie's advances to him were booked as loans.

Then there are a number of fact findings about the Debtor's conduct *during* the State Court Lawsuit, long after Tweedie made any advances of funds to the Debtor. Finding of fact no. 64 states that the Debtor sold property in the "second half of 2009" and again in January, 2010 in violation of an order entered in the State Court Lawsuit on November 16, 2009. Finding of fact no. 65 also states that the Debtor violated the November 16, 2009 order entered in the State Court Lawsuit and makes multiple findings regarding the Debtor's employment in 2009 and 2010, and then extensively describes both the substance and the manner of the Debtor's and Semeniuk's testimony about such employment during the arbitration.

Quite apart from those findings of fact that at least somehow relate to the Debtor's and Tweedie's involvement in the juice business, the Arbitration Award is also full of findings of fact concerning the personal lives of the Debtor and Semeniuk (e.g., finding of fact nos. 2, 4, 48 and 101), which are not worth repeating.

Applying a rigorous collateral estoppel analysis to these varied findings of fact is exceedingly difficult. The Arbitration Award does not explain the purpose of these findings of fact or how they relate to any loss suffered by Tweedie that was proximately caused by his reliance on the Debtor's misrepresentations. Nor does the Arbitration Award explain which of these findings of fact relate to which of the many causes of action set forth in the State Court Complaint. No attempt is made to explain how they are relevant to any of the amounts sought by Tweedie from the Debtor, let alone how they caused a loss by Tweedie and what amount of loss they caused.

The Arbitration Award concludes by awarding the sum of $5,442,846.47 to Tweedie. The only finding of fact regarding the proximate cause of this debt is finding of fact no. 63. However, that finding of fact does not connect the entire amount of the Arbitration Award to the material misrepresentations made by the Debtor that are actionable under § 523(a)(2)(A) of the Bankruptcy Code. Finding of fact no. 63 does not describe the specific conduct that is the proximate cause of each item of this enormous debt, but states only in a very general way that "Tweedie has been damaged as the direct, proximate result of Hermoyian's and Semeniuk's conduct." That is not a clear, definite and unequivocal finding that the entire debt owing to Tweedie was proximately caused by Tweedie's reliance on material misrepresentations made by the Debtor. Instead, it is a finding that several years of multiple acts, conduct and omissions by the Debtor, Semeniuk and the Debtor's Companies, alleged in Counts VII through XVII of the State Court Complaint, created a debt that the Arbitrator found to aggregate $5,442,846.47. This finding therefore does not satisfy the causation in fact component of the proximate cause element. The Debtor's misrepresentations were found to be the cause in fact of Tweedie advancing funds to the Debtor, which Tweedie is obligated to repay to Alden State Bank. But the Arbitration Award does not specifically find that the Debtor's misrepresentations were the cause in fact of any of the other items of damages contained in the Arbitration Award.

The second component of proximate cause, legal causation, is even more glaringly absent. There is not one shred of a finding of fact in the Arbitration Award to support the notion that the Debtor could reasonably have expected that the misrepresentations he made to induce Tweedie to advance a total of $378,297.58 would result in such a large amount of damages to Tweedie. Frankly, it defies common sense and logic to even suggest that the Debtor could have possibly

-39-

foreseen that his misrepresentations to induce Tweedie to advance $378,297.58 to fund the juice business could somehow result in a staggering $5.4 million liability. But even accepting the Arbitrator's conclusion that the Debtor owes this enormous debt to Tweedie, the Arbitration Award does not clearly, definitely and unequivocally find that Tweedie's reliance on the Debtor's misrepresentations was either the legal causation or causation in fact for any portion of this award other than the unpaid balance of Tweedie's loans with Alden State Bank.

Similarly, the conclusions of law in the Arbitration Award do not support the contention that the entire Arbitration Award was proximately caused by Tweedie's reliance on the misrepresentations made by the Debtor. Conclusion of law no. 1 contains a finding that the Debtor's Companies, the Debtor and Semeniuk were all alter egos of one another. Conclusion of law no. 2 addresses the misrepresentations made by the Debtor. Conclusion of law no. 3 finds that the Debtor and Semeniuk breached common law duties of a fiduciary. Conclusion of law no. 4 likewise finds breaches of fiduciary duty by officers of the Debtor's Companies. Conclusion of law no. 5 again finds breaches of fiduciary duties by officers of the Debtor's Companies. Conclusion of law no. 6 holds that there were breaches of partnership fiduciary duties. Conclusion of law nos. 7, 8 and 9 relate to misrepresentations, but conclusion of law nos. 10 through 14 do not. Conclusion of law no. 10 relates to Tweedie's right to a "return of capital." Conclusion of law no. 11 relates to conspiracy. Conclusion of law no. 12 relates to a constructive trust. Conclusion of law no. 13 states in the most general terms that "[a]s a direct and proximate result of the acts and/or omissions committed" by the Debtor and Semeniuk, Tweedie "has been damaged . . . ." Conclusion of law no. 14 relates to attorney fees.

By making so many findings of fact and conclusions of law about the Debtor's and Semeniuk's conduct, lumping them together, and then stating in finding of fact no. 63 and conclusion of law no. 13 that Tweedie was damaged "as a direct and proximate result of Hermoyian's and Semeniuk's conduct," the Arbitration Award makes it impossible to ascertain how much of the total debt, if any, other than Tweedie's advances of money, was proximately caused by any particular conduct or, more importantly, by Tweedie's reliance on any misrepresentations. Finding of fact no. 63, and conclusion of law no. 13, which discuss proximate cause in a very general way, lumping together many types of conduct by the Debtor, Semeniuk and the Debtor's Companies, are not sufficiently clear, definite and unequivocal to establish that the entire amount of the Arbitration Award was proximately caused by Tweedie's reliance on the misrepresentations made by the Debtor. Nor does the Judgment in any way inform the Court about what specific conduct was the proximate cause of the different items of damage. The Judgment says only that it confirms the Arbitration Award "with respect to each of Counts VII to XVII," making no findings about which item of damage was awarded with respect to each of these separate counts.

In sum, the Arbitration Award presents a long list of findings of fact and conclusions of law that identify many acts and omissions by the Debtor, the Debtor's Companies, and Semeniuk over a period of years. Some of those acts and conduct do relate to misrepresentations by the Debtor. Most do not. Many do not even relate to the juice business at all. Still others pertain to after the fact events. Some are simply random, irrelevant facts about the personal lives of the Debtor and Semeniuk. The Arbitrator found in favor of Tweedie in the amount of $5,442,846.47. The amount of that debt is binding on this Court. However, the only portion of that debt that was found to be proximately caused by Tweedie's reliance on the Debtor's misrepresentations is $310,987.00, the

balance that the Arbitrator found that Tweedie still owes Alden State Bank. That loss is a non-dischargeable debt under § 523(a)(2)(A) if the fourth and final requirement of collateral estoppel is met.

The last requirement of collateral estoppel is that the parties must have had a full and fair opportunity to litigate the issue. In asserting that he did not have a full and fair opportunity to litigate before the Antrim County Circuit Court, the Debtor makes two arguments. First, the Debtor complained during this adversary proceeding about the scheduling of hearings both before the Arbitrator and before the Antrim County Circuit Court. There is no question that the Debtor appeared in the arbitration, introduced evidence and arguments in the arbitration, and argued before the Antrim County Circuit Court against the entry of the Judgment confirming the Arbitration Award. The Debtor was represented in the arbitration and in the hearing before the Antrim County Circuit Court regarding the entry of the Judgment by the very same counsel that represented the Debtor in this adversary proceeding. Despite the Debtor's obvious dissatisfaction with the scheduling of hearings and the outcome in the Arbitration Award, there is no question that the Debtor had a full and fair opportunity to litigate all of the identical issues concerning false representations now before this Court, all of which were raised by the State Court Complaint and determined in the State Court Lawsuit.

The Debtor's second argument is that the law of the case, as expressed in this Court's ruling lifting the stay to allow the arbitration to go forward, precluded the Arbitrator from making the extensive factual and legal findings that he did. The Debtor previously raised this same argument in a motion seeking to hold Tweedie and the Arbitrator in contempt, filed in the main bankruptcy case on January 10, 2011. In that motion, the Debtor argued that the Court limited the scope of the

arbitration proceeding in a way that precluded the Arbitrator from making any factual determinations even indirectly touching on whether the debt could be non-dischargeable. The Court disagreed with the Debtor's reading of the Court's earlier opinion and denied the Debtor's motion. The Court reaffirms that ruling here and again holds that its decision to lift the automatic stay to allow the arbitration to go forward did not preclude the Arbitrator from making findings of fact to support any award that he made.

The Debtor has not stated any grounds recognized by Michigan law to find that he was denied a full and fair opportunity to litigate the issues concerning his misrepresentations to Tweedie, and the amount of the loss proximately caused by Tweedie's reliance on those misrepresentations. See Monat v. State Farm Ins. Co., 677 N.W.2d at 845-46 n.2. The Court finds that the fourth requirement of collateral estoppel has been satisfied by the Arbitration Award.

The Court concludes that all four requirements of collateral estoppel are present with respect to $310,987.00 of the Arbitration Award. That sum is non-dischargeable under § 523(a)(2)(A). The balance of the Arbitration Award is not a debt that constitutes a loss proximately resulting from reliance on misrepresentations made by the Debtor to Tweedie.

<u>False Pretenses</u>

Count I of Tweedie's complaint in this adversary proceeding also seeks a determination of non-dischargeability under § 523(a)(2)(A) based on false pretenses. "A 'false pretense' involves an implied misrepresentation or conduct intended to create or foster a false impression. A false pretense has been defined to include a 'mute charade,' where the debtor's conduct is designed to convey an impression without oral representation." Schafer v. Rapp (In re Rapp), 375 B.R. 421, 433 (Bankr. S.D. Ohio 2007) (quotation marks and citation omitted). It has also been described as

-43-

"usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction . . . ." Evans v. Dunston (In re Dunston),117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part and rev'd in part on other grounds*, 146 B.R. 269 (D. Colo. 1992). The failure to disclose a material fact can form the basis of either a material misrepresentation or false pretense. See Semaan v. Allied Supermarkets, Inc., 951 F.2d 718, 728 (6th Cir. 1991) ("That such deception takes the form of an intentional nondisclosure of a material fact or an implied representation makes no difference."). A debtor's silence may also "create a false impression which would be actionable under § 523(a)(2)(A) . . . ." Brann v. Oxford (In re Oxford), 440 B.R. 772, 777 (Bankr. W.D. Ky. 2010) (citation omitted).

Although Count I of Tweedie's complaint in this adversary proceeding alleges in paragraph 20 that the Debtor obtained advances of money from Tweedie based upon false pretenses, the complaint does not specifically identify any additional facts to support the allegation of false pretenses beyond the Debtor's express misrepresentations to Tweedie. Paragraph 23 of the adversary proceeding complaint alleges that the "Debtor failed to disclose" to Tweedie that the 17 misrepresentations alleged in paragraph 21 "were not or might not be truthful." A straightforward reading of paragraphs 20 and 23 is that Tweedie's false pretenses claim is entirely premised on the Debtor's failure to tell Tweedie that his express representations about how he was actually spending the money advanced by Tweedie were false. The adversary complaint does not allege any other conduct by the Debtor that would constitute false pretenses.

Similarly, paragraph 16 of the State Court Complaint alleged that the Debtor failed to disclose certain facts to him including that the 22 affirmative "false statements" alleged to have been made by the Debtor in paragraph 15 of the State Court Complaint "were or might not be . . . true."

-44-

Count XII of the State Court Complaint then pled a silent fraud claim, which incorporated by reference all prior allegations stated in paragraphs 1 through 81. Paragraph 83 alleged that "[b]y virtue of the conduct described above," the Debtor "had an affirmative duty to disclose the truth at all pertinent times" to Tweedie. Paragraph 84 further alleged that the Debtor breached "the duty described above." Paragraph 85 alleged that Tweedie relied on the Debtor's "omissions to disclose the truth[.]" Paragraph 86 alleged that the Debtor's failure to disclose the truth "operated as a silent fraud upon [Tweedie]." Even though 17 of the 22 "false statements" alleged in paragraph 15 of the State Court Complaint may not use the exact same language, they are identical to the 17 misrepresentations alleged in paragraph 21 of Tweedie's adversary proceeding complaint. The State Court Complaint put in issue before the trier of fact in the State Court Lawsuit that the Debtor failed to disclose to Tweedie that he was lying to him about how he was spending the money advanced by Tweedie for the juice business.

As required by collateral estoppel principles under Michigan law, the Court must review the findings of fact and conclusions of law in the Arbitration Award to determine whether the Arbitration Award actually litigated and necessarily determined that the Debtor engaged in false pretenses to establish this basis for Tweedie's § 523(a)(2)(A) claim.

The Arbitration Award does contain certain findings of fact regarding the Debtor's failure to disclose facts to Tweedie. Finding of fact no. 9 states that the Debtor "never disclosed" to Tweedie that the Debtor's "ownership interest in AVCS was 85%" and 43% in "ABF." Finding of fact no. 11 states the Debtor "never disclosed to Tweedie that during this time AVCS had a negative net worth or negative cash flow." Findings of fact nos. 13, 14, 16, 17, 24, 31, 36, 41, and 44 delineate exactly how the Debtor spent the funds advanced by Tweedie to make some payments to

-45-

Breeze Freeze while most of Tweedie's funds were used by the Debtor to pay business expenses for AIM Vending & Coffee Service, Inc. or the Debtor's own personal expenses. Findings of fact nos. 15, 18, 31, 36, 41 and 44 state that the Debtor either "never informed" or "never disclosed" to Tweedie exactly how the funds advanced by him for the juice business were actually being spent. Finding of fact no. 23 states that the Debtor "never disclosed to Tweedie that AVSC and ABF were not operated as two separate entities after April 2006." Finding of fact no. 59 states that the Debtor "never disclosed to Tweedie the (a) net losses of the businesses; (b) the minimal taxable income or losses reported by the businesses; or (c) the money from the businesses [he] took for personal expenditures." After considering each of these findings of fact, and disregarding those factual findings that are made up of statements about an insider's financial condition, the Court is convinced that the Arbitrator did determine that the Debtor failed to disclose to Tweedie that he was using some of the funds advanced by Tweedie for the vending business and for the Debtor's personal purposes instead of using them entirely for the juice business. This issue was actually litigated.

The Court must next determine whether the Debtor's failure to be truthful with Tweedie about the way he spent the funds advanced by Tweedie was necessarily determined in the Arbitration Award. Conclusion of law no. 2 specifically addresses the non-disclosures made by the Debtor. It states that "[w]hen the aforesaid non-disclosures occurred, [the Debtor] [knew] or believed them to be material to Tweedie's decision to advance money . . . and [knew] or believed that the non-disclosures would deceive and mislead Tweedie." Conclusion of law no. 7 states that the Debtor obtained the money advanced by Tweedie by false pretenses. The Court concludes that the Arbitrator expressly found that the Debtor failed to disclose material facts in order to lead Tweedie to have a false impression about the true state of the juice business. The Debtor did not

-46-

disclose the fact that he did not establish and operate a separate business entity for the juice business. The Debtor did not disclose the level of his commingling of the juice business with the Debtor's vending business. The Debtor did not disclose to Tweedie that he used the funds advanced by Tweedie for his own personal expenses. Further, conclusion of law nos. 2 and 7 in the Arbitration Award clearly, definitely and unequivocally state that "the money advanced by Tweedie" to the Debtor was obtained by false pretenses. The Court is persuaded that the same facts and issues required for a false pretense theory under § 523(a)(2)(A) were actually litigated and necessarily determined in the Arbitration Award.

All of the other remaining elements for a non-dischargeable debt under § 523(a)(2)(A) of the Bankruptcy Code because of false pretenses are present. In re Oxford, 440 B.R. at 777 (for false pretenses, a "creditor must still show reliance, materiality, and intent"). The Court already analyzed each of these elements in the section of this opinion discussing Tweedie's affirmative misrepresentations. The Court's analysis regarding the Debtor's intent, Tweedie's reliance, and the proximate cause elements of the Debtor's false representations theory applies with equal force to Tweedie's false pretenses theory under § 523(a)(2)(A). But the loss that was proximately caused by the Debtor's false pretenses is the very same loss that was proximately caused by Tweedie's reliance on the express misrepresentations made by the Debtor. The Debtor's false pretenses, together with the Debtor's misrepresentations, induced Tweedie to borrow funds from Alden State Bank and advance them to the Debtor for the juice business. The loss proximately caused by the Debtor's false pretenses is the same outstanding balance of $310,987.00 owing by Tweedie to Alden State Bank. There are no clear, definite and unequivocal findings of fact in the Arbitration Award that demonstrate that any other portion of the Arbitration Award is a loss that was proximately

caused by false pretenses. The sum of $310,987.00 is the only portion of the Arbitration Award that is non-dischargeable under § 523(a)(2)(A) for false pretenses. The balance of the Arbitration Award is not.

## Actual Fraud

Tweedie's final claim for relief under § 523(a)(2)(A) is based on actual fraud. "The Bankruptcy Appellate Panel for the Sixth Circuit articulated the standard that applies in non-dischargeability cases under § 523(a)(2)(A) premised on actual fraud." Morganroth & Morganroth, PLLC v. Stollman (In re Stollman), 404 B.R. 244, 257 (Bankr. E.D. Mich. 2009). "'[A]ctual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions.'" Id. (quoting Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (6th Cir. B.A.P. 2001) (adopting the position of the Seventh Circuit Court of Appeals in McClellan v. Cantrell, 217 F.3d 890 (7th Cir. 2000)). "'[B]y distinguishing between "a false representation" and "actual fraud," the statute makes clear that actual fraud is broader than misrepresentation.'" Id. (quoting Vitanovich, 259 B.R. at 877).

> [A]ctual fraud encompasses **any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.** . . . When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.

Id. (internal quotation marks and citations omitted) (emphasis in original). As with misrepresentation and false pretenses, a plaintiff must also prove intent, justifiable reliance and proximate cause. Field v. Mans, 516 U.S. 59, 74-75 (1995).

Count I of Tweedie's adversary proceeding complaint relies on the identical conduct detailed in paragraph 21 to support all three grounds for relief under § 523(a)(2)(A): misrepresentation, false

-48-

pretenses and actual fraud. Paragraph 24 then summarily states that the Debtor "engaged in the aforesaid conduct with the purpose and effect of it operating as a fraud on, and a deceit of, [Tweedie]." These essentially same false statements are also alleged in paragraph 15 of the State Court Complaint. The State Court Complaint did outline other conduct (e.g., the Debtor did not legitimately earn the money he invested in his business; and the Debtor's sale of vending machine products violated his obligations to his vendors). But this other conduct is not asserted as the factual basis for Tweedie's claim that the debt to him is non-dischargeable because of actual fraud. Count XI of the State Court Complaint alleged both misrepresentations and fraud, but it does not detail any new or different conduct. Instead, it simply incorporates all of the prior allegations in the State Court Complaint. Actual fraud was put into issue by the pleadings and submitted to the trier of fact in the State Court Lawsuit. But the factual basis for the actual fraud was the very same set of false statements that Tweedie relied upon in alleging misrepresentation and false pretenses.

The next step in applying collateral estoppel principles to Tweedie's actual fraud claim is ascertaining what the finder of fact determined about a scheme, artifice or trick, involving the direct and active operation of the mind, to cheat Tweedie.

Finding of fact no. 62 states that neither the Debtor nor Semeniuk "testif[ied] that they did not conspire and collaborate with one another against, or with the purpose or result of defrauding and damaging, Tweedie." But were they ever asked the question? The Court cannot conclude, using the principles of collateral estoppel, that the double negatives in this finding of fact somehow make a positive: that the Debtor's and Semeniuk's lack of testimony that they did not conspire and collaborate constitutes a clear, definite and unequivocal finding that they in fact did conspire and collaborate. Finding of fact no. 66 states that the economic benefits, including the money obtained

by the Debtor and Semeniuk, were "acquired by their conversion, fraud, misrepresentation, breaches of duty, and other wrongdoing perpetrated by them on, and adversely affecting, Tweedie such that it would be unconscionable for [the Debtor] and Semeniuk to retain the benefits." This sweeping statement, untethered to any specific facts finding a scheme involving the direct and active operation of the mind, is not sufficiently clear, definite and unequivocal to establish that actual fraud was actually litigated in the Arbitration Award.

The Court concludes that actual fraud was not actually litigated by the Arbitration Award. Relying solely on collateral estoppel principles, Tweedie has failed to meet his burden of proof to show actual fraud for purposes of § 523(a)(2)(A). Because there is no other evidence in the record to demonstrate that the Debtor defrauded Tweedie, the Court cannot find a non-dischargeable debt under § 523(a)(2)(A) based on actual fraud.

To recap, the Court finds that the requirements of collateral estoppel have been met under § 523(a)(2)(A) based on misrepresentations and false pretenses, but not actual fraud, and Tweedie has met his burden of proof that the sum of $310,987.00 is a non-dischargeable debt.

### Section 523(a)(4) of the Bankruptcy Code

Count II of Tweedie's complaint in this adversary proceeding seeks a determination of non-dischargeability under § 523(a)(4) of the Bankruptcy Code based upon the Debtor's breach of fiduciary duties. Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity . . . ." The Sixth Circuit has held that § 523(a)(4) requires:

(1) a fiduciary relationship

       (a) in the form of an express trust or

       (b) technical trust relationship;

-50-

(2) breach of that fiduciary relationship; and

(3) a resulting loss.

Board of Trustees of Ohio Carpenters' Pension Fund v. Bucci (In re Bucci), 493 F.3d 635, 639-40 (6th Cir. 2007) (citations omitted).

The question of who is a fiduciary for purposes of § 523(a)(4) of the Bankruptcy Code is one of federal law. See Carlisle Cashway, Inc. v. Johnson (In re Johnson), 691 F.2d 249, 251 n.2 (6th Cir. 1982) ("State law is merely a factor in the equation used to determine whether the fiduciary capacity requirement is satisfied as a matter of federal law, using federal standards."). The Sixth Circuit narrowly construes the fiduciary requirement of § 523(a)(4) to require "the existence of an express or technical trust relationship." R.E. America, Inc. v. Garver (In re Garver), 116 F.3d 176, 178-79 (6th Cir. 1997); see also In re Johnson, 691 F.2d at 251-52 (finding that fiduciary capacity "applies only to express or technical trusts and does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity" and "the requisite trust relationship must exist prior to the act creating the debt and without reference to it") (citing Davis v. Aetna Acceptance Co., 293 U.S. 328, 333-34 (1934)) (other citation omitted). To establish the existence of an express trust, the plaintiff "must demonstrate: (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." Patel v. Shamrock Floorcovering Services, Inc. (In re Patel), 565 F.3d 963, 968 (6th Cir. 2009) (internal quotation marks and citation omitted).

Like his § 523(a)(2)(A) claim, Tweedie's only evidence to prove his § 523(a)(4) claim is the Arbitration Award and his other exhibits. Once again, the Court must carefully review the allegations in the State Court Complaint and the findings of fact and conclusions of law in the Arbitration Award to determine whether the facts sufficient to establish all of the elements of a non-

-51-

dischargeable debt under § 523(a)(4) were both actually litigated and necessarily determined by the Arbitration Award, and whether the Debtor had a full and fair opportunity to litigate such issues in the State Court Lawsuit.

Paragraph 30 of Tweedie's adversary proceeding complaint alleges a fiduciary relationship between Tweedie and the Debtor consisting of a partnership relationship between Tweedie and the Debtor, arising either as a "de facto" partnership, a "de jure" partnership, a "partner by estoppel" or as a "joint venture." Paragraph 31 then alleges that the Debtor breached his fiduciary duties under Michigan's Uniform Partnership Act, Mich. Comp. Laws Ann. § 449.21. This partnership relationship is the only fiduciary capacity alleged in the adversary proceeding complaint. In contrast, the State Court Complaint contained four separate counts that alleged various common law or statutory fiduciary relationships and numerous breaches of those fiduciary duties.[9] Count X of the State Court Complaint, like the complaint in the adversary proceeding, alleged that the Debtor breached fiduciary duties that he owed to Tweedie as a partner under Michigan partnership law, Mich. Comp. Laws Ann. § 449.21. Therefore, the State Court Complaint did put in issue before the trier of fact in the State Court Lawsuit that there was a partnership relationship between the Debtor and Tweedie, that this partnership relationship was a fiduciary relationship, and that the Debtor breached his fiduciary duties that he owed to Tweedie arising from that relationship.

_____

[9] Count VII of the State Court Complaint alleged that the Debtor owed and breached common law fiduciary duties to Tweedie, including duties of good faith and loyalty. Count VIII of the State Court Complaint alleged that the Debtor owed and breached statutory fiduciary duties to Tweedie under Mich. Comp. Laws Ann. § 450.1451a of the Michigan Business Corporation Act. Count IX of the State Court Complaint alleged that the Debtor owed and breached statutory fiduciary duties to Tweedie under Mich. Comp. Laws Ann. § 450.4404 of the Michigan Limited Liability Company Act. Finally, Count X of the State Court Complaint alleged that the Debtor owed and breached statutory fiduciary duties to Tweedie under Mich. Comp. Laws Ann. § 449.21 of the Michigan Uniform Partnership Act.

The findings in the Arbitration Award are very confusing in their treatment of this issue. It is difficult to tell what, if anything, was determined by the trier of fact about this issue in the Arbitration Award. First, there are no findings of fact in the Arbitration Award that there was ever a partnership of any kind between the Debtor and Tweedie. If anything, there are a number of findings of fact in the Arbitration Award that directly refute Tweedie's allegations in paragraph 30 of his adversary proceeding complaint that he and the Debtor were ever "partners." Finding of fact no. 50 states that the Debtor "misrepresented to Tweedie that he and Tweedie were partners," and goes on to state that the Debtor "never told Tweedie they were not partners until 2009." The only plausible reading of this finding of fact is that the misrepresentation consisted of the Debtor telling Tweedie that he was a partner when in fact he was *not* a partner at all. In other words, it was false for the Debtor to say that Tweedie was the Debtor's partner for the very reason that Tweedie *was not in fact the Debtor's partner.* Similarly, finding of fact no. 55 states that the Debtor and Tweedie signed an agreement in which they identified themselves as "shareholders" of Tropical Breeze. This finding of fact is consistent with the stipulation that the Debtor and Tweedie made in the Arbitration Order in which they agreed that Tweedie was an "owner" of 49% of Tropical Breeze. But neither finding of fact no. 55 nor the stipulation in the Arbitration Order in any way find that the Debtor and Tweedie were "partners."

There is only one finding of fact in the Arbitration Award that even arguably supports the allegations in the State Court Complaint that the Debtor and Tweedie were partners. Finding of fact no. 107 broadly states that "the allegations in Tweedie's pleadings are true." But this catch all finding of fact is so obviously and patently inconsistent with itself that it cannot be relied upon for collateral estoppel purposes. Many of the allegations in the State Court Complaint are mutually

-53-

exclusive of one another and therefore cannot *all* be true.  A couple of examples will help illustrate

this point.  Paragraph 9 of the State Court Complaint alleged that Tweedie "at all times since in or

about May, 2006 owned a 49% or 50%" interest in the Debtor's Companies.  This allegation of fact

was repeated in paragraphs 57 and 64 of the State Court Complaint.  But paragraph 15(g) of the

State Court Complaint also alleged that the Debtor made a "false statement" to Tweedie that he "was

an owner of the business."  If paragraph 9's allegation is true (i.e., that Tweedie *was* an owner), then

how can it also be true, as stated in paragraph 15(g), that the Debtor made a "false statement" by

telling Tweedie that he was an "owner of the business"?  Similarly, paragraph 3 of the State Court

Complaint alleged that each of the Debtor's Companies is either a Michigan corporation or a limited

liability company.  Paragraph 58 of the State Court Complaint alleged that the Debtor owed Tweedie

the duties of a director or corporate officer of the Debtor's Companies under Mich. Comp. Laws

Ann. § 450.1451a.  Paragraph 65 of the State Court Complaint alleged that the Debtor owed

Tweedie the duties of a limited liability company manager of the Debtor's Companies under Mich.

Comp. Laws Ann. § 450.4404.  Paragraph 72 of the State Court Complaint alleged that the Debtor

owed Tweedie the duties of a partner in the Debtor's Companies under Mich. Comp. Laws Ann.

§  449.21.  Obviously, the State Court Complaint in various places made allegations in the

alternative.  Notwithstanding finding of fact no. 107's statement that "the allegations in Tweedie's

pleadings are true," it is simply not possible that each of the Debtor's Companies could

simultaneously be a corporation, limited liability company and a partnership.  The blanket statement

in finding of fact no. 107 that all of Tweedie's allegations are true is not a clear, definite and

unequivocal finding that the Debtor and Tweedie were partners.  It is, at best, an internally

inconsistent finding that is not entitled to collateral estoppel effect.

The Arbitration Award's conclusions of law regarding Tweedie's breach of fiduciary duty allegations in the State Court Complaint are equally incongruous. Conclusion of law no. 3 states that the Debtor owed Tweedie a common law duty of a fiduciary. Conclusion of law no. 4 states that the Debtor owed Tweedie a fiduciary duty as an officer pursuant to Mich. Comp. Laws Ann. § 450.1541a. Conclusion of law no. 5 states that the Debtor owed Tweedie a fiduciary duty as a de facto manager pursuant to Mich. Comp. Laws Ann. § 450.4404. Conclusion of law no. 6 states that the Debtor owed Tweedie a fiduciary duty as a partner pursuant to Mich. Comp. Laws Ann. § 449.21. Conclusion of law nos. 3 through 6 do not specifically mention which of the Debtor's Companies, if any, they are referring to. To make matters worse, conclusion of law no. 1 states that the Debtor, the Debtor's Companies and Semeniuk are all "alter egos of one another." Nowhere does the Arbitration Award attempt to reconcile its apparent conflicting findings that the Debtor's Companies are Michigan corporations or limited liability companies, with its various conclusions that the Debtor breached fiduciary duties to Tweedie under Michigan common law, corporate law, limited liability law and partnership law.

In short, it is impossible for this Court to ascertain with any confidence precisely what the Arbitration Award's contradictory findings of fact and conclusions of law found to be the exact nature of any fiduciary relationship between the Debtor and Tweedie, or what was necessary to the Judgment. Therefore, the Court cannot find that the Arbitration Award actually litigated or necessarily determined that the Debtor owed fiduciary duties to Tweedie as a partner. But the Court is able to review the Arbitration Award and conclude with certainty that whatever fiduciary relationship was determined in the Arbitration Award, the fiduciary capacity requirement to make the Arbitration Award a non-dischargeable debt under § 523(a)(4) was not actually litigated.

-55-

The State Court Complaint did not allege an intent to create a trust, a trustee, a trust res and a definite beneficiary. Further, the findings of fact and conclusions of law contained in the Arbitration Award do not establish any of these elements. There are no findings of fact or conclusions of law in the Arbitration Award that establish an intent to create a trust. There are no findings of fact or conclusions of law to demonstrate that the Debtor was a trustee. There are no findings of fact or conclusions of law that identify a trust res. Finally, there are no findings of fact or conclusions of law in the Arbitration Award to establish a definite beneficiary.

It is true that the findings of fact establish that Tweedie advanced funds to the Debtor with the expectation that they would be used for specific purposes. However, there are no findings of fact or conclusions of law to demonstrate that those funds were to be segregated and held in trust. The fact that the Debtor may not have used some of the funds advanced by Tweedie for the purposes that the Debtor represented to Tweedie may give rise to an action under § 523(a)(2)(A) of the Bankruptcy Code, but is woefully insufficient to create an express trust for purposes of § 523(a)(4). See In re Garver, 116 F.3d at 180 (holding that § 523(a)(4) applies "to only those situations involving an express or technical trust relationship arising from the placement of a specific res in the hands of the debtor") (citation omitted). The Court cannot and does not find that the fiduciary capacity element of § 523(a)(4) was either actually litigated or necessarily determined by the Arbitration Award.

In his post-trial brief, Tweedie cites Holmes v. Kraus (In re Kraus), 37 B.R. 126 (Bankr. E.D. Mich. 1984) to support his § 523(a)(4) claim. In Kraus, the court held that an express trust exists under section 21 of the Michigan Uniform Partnership Act, which states:

> "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any

-56-

transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property[.]"

Id. at 130 (quoting Mich. Comp. Laws Ann. § 449.21(1)). The Kraus court explained that Michigan's "Uniform Partnership Act established an *express trust* for which each partner acts as a trustee. The trust is created before the act creating the debt and without any reference to the debt." Id. (emphasis in original). The court in Kraus concluded that Mich. Comp. Laws Ann. § 449.21(1) met the fiduciary capacity requirement under § 523(a)(4) as declared by the Sixth Circuit in Carlisle Cashway, Inc. v. Johnson (In re Johnson), 691 F.2d 249 (6th Cir. 1982).

As noted above, there is no finding of fact in the Arbitration Award that establishes that the Debtor and Tweedie were ever partners. Therefore, this issue was not actually litigated and necessarily determined in the State Court Lawsuit. But even if the Arbitration Award had found that the Debtor and Tweedie were partners, and that the Debtor breached fiduciary duties to his partner under the Michigan Uniform Partnership Act, that would still not be sufficient to demonstrate a fiduciary capacity for purposes of § 523(a)(4) of the Bankruptcy Code. This Court respectfully disagrees with the reasoning of the Kraus court and rejects its holding. See Blashke v. Standard (In re Standard), 123 B.R. 444, 454 n.8 (Bankr. N.D. Ga. 1991) (collecting cases and following those courts that have criticized and expressly declined to follow Kraus).

The Sixth Circuit recognizes "that a statute may create a trust for purposes of § 523(a)(4) if that statute defines the trust res, imposes duties on the trustee, and those duties exist prior to any act of wrongdoing." In re Bucci, 493 F.3d at 640.

The court held in In re Johnson that Michigan's Building Contract Fund Act created a trust relationship sufficient to satisfy the express or technical requirement. That Act defined the trust res as all payments made to a contractor for the benefit of laborers, subcontractors, or materialmen. . . . The Act defined the contractor as the trustee and imposed on the contractor a duty to "use the money in the building

-57-

contract fund to first pay laborers, subcontractors and materialmen on the particular project for which the funds were deposited before he uses the funds for any other purpose." . . . The fiduciary relationship established by the Act arose when a payment was made to a contractor, not whenever a contractor misappropriated the funds; thus, the Act imposed duties on the trustee prior to any act of wrongdoing.

Id. (citing and quoting In re Johnson, 691 F.2d at 252).

The holding in Kraus fails to comport with the requirements articulated in Johnson. An express trust is simply not created by the plain statutory language of Mich. Comp. Laws Ann. § 449.21(1). At most, a trust *ex maleficio* arises under that statute at the moment a partner engages in transactions that are contrary to the interests of the partnership or other partners. In re Standard, 123 B.R. at 454 (determining that Georgia statute Ga. Code Ann. § 14-8-21(a), identical to Mich. Comp. Laws § 449.21(1), did "not establish an express or technical trust" and instead "the trust created is a trust *ex maleficio* and does not create a fiduciary relationship within the meaning of § 523(a)(4)"). The statutory language of Mich. Comp. Laws Ann. § 449.21(1) plainly provides that a partner only becomes a trustee of "any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property[.]" Thus, the requisite fiduciary relationship springs into existence under this statute only at the time of the wrongful act creating the debt. As repeatedly explained by the Sixth Circuit Court of Appeals,

the term "fiduciary capacity" is narrower [under § 523(a)(4)] than it is in some other contexts: section 523(a)(4) covers only "express" or "technical trusts" and not trusts arising out of "the very act of wrongdoing." These "constructive trusts," which arise *ex maleficio* (at the time the wrong is done), do not satisfy the "fiduciary capacity" requirement because the debtor was not "a trustee before the wrong."

Patel v. Shamrock Floorcovering Services, Inc. (In re Patel), 565 F.3d 963, 968 (6th Cir. 2009) (quoting Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934)). The fiduciary duty of one

-58-

partner to another under state partnership law is not enough to find a fiduciary capacity as a matter of federal law under § 523(a)(4) of the Bankruptcy Code.

The Arbitration Award contains a litany of acts and omissions by the Debtor, Semeniuk and the Debtor's Companies that the Arbitrator relied upon to determine the amount of the debt. In applying collateral estoppel, the Court is unable to find that the facts necessary to establish "fraud or defalcation while acting in a fiduciary capacity" for purposes of § 523(a)(4) were either actually litigated or necessarily determined by the Arbitration Award. Because this third requirement of collateral estoppel has not been met, the Court need not determine whether the Debtor had a full and fair opportunity to litigate the issue. There is no other evidence in the record before this Court to demonstrate a non-dischargeable debt under § 523(a)(4). The Court holds that Tweedie failed to prove that any portion of the Arbitration Award is non-dischargeable under § 523(a)(4) of the Bankruptcy Code.

### Section 523(a)(6) of the Bankruptcy Code

Count III of Tweedie's complaint in this adversary proceeding seeks a determination of non-dischargeability under § 523(a)(6) of the Bankruptcy Code. Under § 523(a)(6), a debt for a willful and malicious injury is not dischargeable. "Willfulness" has been defined as the (i) desire to cause the consequences of the act or (ii) belief that the consequences are substantially certain to result. Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998); Kennedy v. Mustaine (In re Kennedy), 249 F.3d 576, 580 (6th Cir. 2001) (citations omitted).

-59-

> [M]erely because [a debtor] did not act in a prudent manner, does not mean that the [debtor]'s actions give rise to a nondischargeable debt under § 523(a)(6). Instead, the Supreme Court of the United States has held that the term "willful," as used in § 523(a)(6), is limited to only those instances where a person acts with the specific intent to cause injury, or is substantially certain that, by his or her actions, an injury will occur.

Graffice v. Grim (In re Grim), 293 B.R. 156, 167 (Bankr. N.D. Ohio 2003) (citing Kawaauhau v. Geiger, 523 U.S. at 63-64) (other citations omitted) (holding a debt arising out of a questionable investment to be dischargeable because the plaintiff did not prove that the debtor "had any actual knowledge that [the] investment . . . would fail" or that the debtor "set out to deprive [the investors] of their money").

"Malice" for purposes of § 523(a)(6), was defined by the Supreme Court in Tinker v. Colwell, 193 U.S. 473 (1904), as "a wrongful act, done intentionally, without just cause or excuse." Id. at 485-86 (interpreting analogous § 17(a)(2) of the former Bankruptcy Act) (internal quotation marks and citation omitted); see also Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 465 n.10 (6th Cir. 1999) (finding that a "lack of an excuse or justification for [a debtor's] actions will not alone make [a] debt non-dischargeable under § 523(a)(6)"). Alternately, malice has been defined as acting "'in conscious disregard of one's duties . . . .'" Qui v. Zhou (In re Zhou), 331 B.R. 274, 276 (Bankr. E.D. Mich. 2005) (quoting Gonzalez v. Moffitt (In re Moffitt), 252 B.R. 916, 923 (B.A.P. 6th Cir. 2000) and citing Monsanto Co. v. Trantham (In re Trantham), 304 B.R. 298, 308 (B.A.P. 6th Cir. 2004)).

Paragraph 34 of Tweedie's adversary proceeding complaint alleges that the Debtor owes Tweedie a non-dischargeable debt under § 523(a)(6) "to the extent that . . . Debtor's conduct constituted conversion." Paragraph 35 describes Tweedie's "property rights" as "a right to own part of the Business and/or assets of the Business" and a right to a return of the money that Tweedie

borrowed from Alden State Bank which was "specifically entrusted to Defendant Debtor and earmarked." Paragraph 36 alleges that the Debtor converted those property rights by "taking money from the business" and "using the money for purposes other than those for which the money was entrusted and earmarked and failing to return the money to [Tweedie]." Paragraph 37 alleges that the Debtor's conduct was willful and malicious. Tweedie's entire § 523(a)(6) claim is based upon conversion, not any other conduct by the Debtor.

The State Court Complaint also alleged conversion in Count XIV. Paragraph 95 of the State Court Complaint described Tweedie's "property rights" as the "right to own part of the business and/or the assets" of the Debtor, Semeniuk and the Debtor's Companies, plus "a right to the money, and to a return of the money, that was advanced by [Tweedie] through loans from Alden State Bank which was specifically entrusted" by Tweedie to the Debtor and "earmarked to be used only for particular, ordinary and necessary business purposes." Paragraph 96 of the State Court Complaint alleged that the Debtor converted these property rights by "mismanaging the business and taking money from the business to pay for personal, non-business expenses" for himself and Semeniuk, "using the money for purposes other than those for which the money was entrusted and earmarked and failing to return that money to [Tweedie]." The State Court Complaint further alleged in paragraph 99 that the Debtor's conduct was "wanton or willful." Although Tweedie also alleged in various places in both complaints that he had a property right to "own a part of the business and/or the assets of the business," he did not allege in either complaint that the Debtor converted any ownership interest or the business assets. The only fair reading of both the State Court Complaint and the adversary proceeding complaint is that Tweedie alleged that the property converted by the

-61-

Debtor consisted solely of the money that Tweedie advanced to the Debtor or the Debtor's Companies.

The State Court Complaint clearly put the issue of conversion before the trier of fact in the arbitration proceeding. Conversion under Michigan law "is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." Thoma v. Tracy Motor Sales, Inc., 104 N.W.2d 360, 362 (Mich. 1960) (quotation marks and citation omitted). Conversion can create a non-dischargeable debt if the debt is the result of a willful and malicious injury. See Morganroth & Morganroth, PLLC v. Stollman (In re Stollman), 404 B.R. 244, 262 (Bankr. E.D. Mich. 2009) ("'[A]n act of conversion, if willful and malicious, is an injury to property within the scope of [the § 523(a)(6)] exception' [to discharge].") (quoting Davis v. Aetna Acceptance Co., 293 U.S. at 332 (using as an example "where the wrong was unexcused and wanton")).

The Court must once again review the findings of fact and the conclusions of law in the Arbitration Award to determine whether the Arbitration Award actually litigated and necessarily determined that the Debtor converted Tweedie's property rights, and did so willfully and maliciously, such that all of the elements of a non-dischargeable debt under § 523(a)(6) are met.

The Arbitration Award contains findings of fact that detail seven instances where Tweedie advanced funds to the Debtor or to the Debtor's Companies for specific business purposes: finding of fact nos. 12, 16, 24, 30, 35, 40 and 44. In each instance where funds were advanced, the Arbitration Award states as a finding of fact that the Debtor either told Tweedie or led Tweedie to believe that the Debtor used the funds for the intended purpose, never disclosing that he had used them for other purposes. Finding of fact nos. 66 and 67 contain broad findings that the Debtor

acquired economic benefits, including money, assets, business opportunities and things of value, by conversion and by other conduct, using his personal, lifelong relationship with Tweedie and Tweedie's trust to have Tweedie advance money, knowing the funds would not be used in the manner and for the purposes represented to Tweedie. In addition, finding of fact no. 67 states that there was no evidence that the Debtor had the ability or intent to pay the promised profits of the ventures funded by Tweedie. Further, finding of fact no. 86 states that "[t]he purported entities' funds paid for clothing, hair salons, personal vacations, residential utilities, home repairs of [the Debtor] and Semeniuk[.]" This finding was made after a series of findings concerning the lack of corporate formalities and commingling of funds, space, employees and other resources of the "purportedly separate entities." Finding of fact no. 88 states that the Debtor caused Tropical Breeze to pay $30,000 of its funds for a recreational ski boat in the Debtor's name.

Conclusion of law no. 10 then specifically addresses the State Court Complaint's Count XIV for conversion. It states that Tweedie had certain property rights such as "a right for the return of the capital that he had advanced to [the Debtor] and entrusted to [the Debtor] . . . which was specifically intended for business purposes." Conclusion of law no. 10 goes on to state that the Debtor converted Tweedie's property rights by "utilizing [Tweedie's] funds for [the Debtor's] own personal, non-business expenses; and by using Tweedie's funds for purposes other [than] for those [for] which the money was entrusted and earmarked and for failing to refund that money to Tweedie."

The Arbitration Award expressly found that the Debtor converted Tweedie's money by using it for personal purposes instead of the business purposes that the Debtor told Tweedie he would use it for. The Arbitration Award also expressly found that Tweedie was harmed by this conduct, and

-63-

that a debt arose as a result. However, these findings by themselves do not establish a § 523(a)(6) debt because under Michigan law, "the tort of conversion does not require an intent to violate the property rights of another, or knowledge that one is violating the property rights of another. Rather, the tort can be committed 'unwittingly[.]'" McCallum v. Pixley (In re Pixley), 456 B.R. 770, 788 (Bankr. E.D. Mich. 2011) (quoting Foremost Ins. Co. v. Allstate Ins. Co., 486 N.W.2d 600, 606 (Mich. 1992)). Nor does conversion require malice. "'[Neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.'" Id. (quoting J. Franklin Interests, L.L.C. v. Mu Meng, No. 296525, 2011 WL 4501841, at *9 (Mich. Ct. App. Sept. 29, 2011)). The Arbitration Award's findings regarding conversion only provide a basis for a non-dischargeable debt if the conversion is also found to be both willful and malicious.

Count XIV of the State Court Complaint did not allege that the Debtor willfully and maliciously converted Tweedie's money. Instead, Tweedie alleged in paragraph 99 of the State Court Complaint only that the Debtor's conduct in converting the money was "wanton or willful." That is not the same thing as "willful and malicious." The issue of a willful and malicious injury was not submitted to the trier of fact in the arbitration. Therefore, it was not actually litigated in the State Court Lawsuit.

Moreover, a review of the Arbitration Award shows that the Arbitrator did not even find that the Debtor's conduct in converting Tweedie's property was "wanton or willful," as alleged in the State Court Complaint, let alone find that the Debtor's conversion was "willful and malicious," as required by § 523(a)(6). Neither the two findings of fact regarding conversion (finding of fact nos. 66 and 67) nor the conclusion of law regarding conversion (conclusion of law no. 10) use either of the words "wanton" or "willful." The closest finding of fact regarding Count XIV's allegation

that the Debtor's conversion was "wanton or willful" is finding of fact no. 107, which contains the broad statement that "[t]he allegations in Tweedie's pleadings are true[.]" However, at best, this catch all finding only establishes that the Debtor's conversion either was wanton *or* willful, but not wanton *and* willful, and certainly not willful and malicious. Compare In re Pixley, 456 B.R. at 787 (finding that the actually litigated element of collateral estoppel was met because the plaintiff's state court clearly alleged that the debtor's act of conversion was willful and malicious). See also Graffice v. Grim, 293 B.R. at 167 (holding that "the terms 'willful' and 'malicious' are separate and distinct concepts, and as a result, both requirements, as defined by federal law, must be established in order to have a debt held nondischargeable") (citation omitted).

Nor does the Arbitration Award make any finding of fact that the Debtor ever intended to injure Tweedie. There are multiple findings of fact that the Debtor intended to deceive Tweedie into giving the Debtor funds for the juice business. But that does not equate to a finding that the Debtor either intended that Tweedie would lose those funds or was substantially certain that Tweedie would suffer an injury. To the contrary, some of the findings of fact in the Arbitration Award actually support the opposite conclusion: that the Debtor intended that Tweedie be protected from injury. For example, Tropical Breeze paid Alden State Bank instead of paying the Debtor's or Semeniuk's mortgage payments (finding of fact no. 91). Further, "to protect Tweedie's interests," the Debtor arranged to have promissory notes and security agreements prepared and executed in 2007 (finding of fact no. 47).

In addition, at trial there was uncontroverted testimony by the Debtor that he continued to pay Tweedie's loans with Alden State Bank even after he stopped paying his own mortgage, up to November, 2008. The Debtor's testimony, although admittedly self-serving, does not evidence that

-65-

he had an intent to injure Tweedie, even if his actions were found by the Arbitration Award to have caused harm to Tweedie. See Cash America Financial Services, Inc. v. Fox (In re Fox), 370 B.R. 104, 119 (B.A.P. 6th Cir. 2007) (affirming that a debt was not excepted from discharge under § 523(a)(6) where the "the evidence at trial suggested that" the debtor was "aggressively trying to expand its operations," that most of the funds were spent trying to keep the business afloat, and the debtor's "attempts to keep [the corporation] in business and expand its operations suggest he intended to benefit, rather than harm, the [plaintiff] by continuing to collect on its Accounts"); Lively v. Knight (In re Knight), No. 05-3154, 2007 WL 1484494, at *6 (Bankr. E.D. Tenn. May 18, 2007) (finding no willful and malicious injury through conversion of business assets because there was no evidence of the debtor's intent to sabotage the business, but instead found only that the debtor was not a good salesman and had no prior experience in the business).

It is true that the Arbitration Award found that the Debtor made material misrepresentations to Tweedie to get him to advance funds for the juice business. It is also true that the Debtor imprudently commingled the juice business with his vending business, and that both businesses ultimately failed, leaving him and his businesses unable to pay Tweedie's loans from Alden State Bank. But those facts do not demonstrate that the Debtor had a specific intent to injure Tweedie or was substantially certain that Tweedie would be injured. The Arbitration Award does not make such findings. Nor does the Arbitration Award's use of the words "willful" or "fraudulent" in describing a conspiracy and a myriad of other conduct by the Debtor, Semeniuk and the Debtor's Companies suffice.

Tweedie's post-trial brief points to two other sections in the Arbitration Award as establishing that the Debtor's conversion was willful and malicious. Neither of these are in the

findings of fact, but instead are in two conclusions of law. Conclusion of law no. 11 states that the Debtor and Semeniuk "willfully, intentionally, fraudulently and through concerted action conspired among themselves" to take various actions. Conclusion of law no. 11 addresses a conspiracy by the Debtor and Semeniuk but does not address the alleged conversion of property by the Debtor, which is the sole basis for Tweedie's § 523(a)(6) claim. Conclusion of law no. 12 states that the economic benefits that the Debtor and Semeniuk treated as theirs were acquired by conversion, among other wrongdoings, such that it would be "unconscionable" for the Debtor and Semeniuk to retain those benefits. But again, no finding that the act of conversion was willful and malicious. Conclusion of law no. 12 then imposes a constructive trust for the benefit of Tweedie on the existing and future tangible and intangible property and property rights of the Debtor and Semeniuk, and the proceeds thereof. It is hard to understand how the Arbitrator could conceivably impose a constructive trust on the assets of an individual in a Chapter 7 case, especially in light of the limited relief provided by this Court's order lifting the stay to allow the arbitration to proceed. More importantly, this conclusion does not state that the Debtor's act of conversion was willful and malicious. Undoubtedly, both conclusion of law nos. 11 and 12 contain very harsh language. But neither of these conclusions of law contain factual findings that are clear, definite and unequivocal that the Debtor acted both willfully and maliciously in *converting* Tweedie's property, which is the gravamen of Tweedie's § 523(a)(6) action.

The Court concludes that willfulness and malice were neither actually litigated nor necessarily determined by the Arbitration Award on Tweedie's claim for conversion in Count XIV

of the State Court Complaint.[10]  With these elements of collateral estoppel missing, the Court need

not decide whether the Debtor had a full and fair opportunity to litigate these issues.  Without other

evidence in the record to demonstrate that the Debtor's conversion of Tweedie's property was

willful and malicious, the Court cannot conclude that the Arbitration Award's finding of conversion

by itself is sufficient to make out a non-dischargeable debt under § 523(a)(6) of the Bankruptcy

Code.

## Conclusion

On August 25, 2010, the Court entered an order that explained in detail how and why the

automatic stay was lifted in this case.  The order specifically provided that the Arbitrator should only

arbitrate "the issues of whether there is a debt owing by the Debtor, Michael George Hermoyian,

to John Tweedie and, if there is a debt, to liquidate the amount of that debt and render an award in

such amount."  The Arbitrator determined that there is a debt owing and liquidated the amount.

However, it is up to this Court to decide whether that amount is a non-dischargeable debt under

§ 523(a)(2)(A), (4), or (6) of the Bankruptcy Code.  Tweedie has the burden of proving each element

of a non-dischargeable debt by a preponderance of the evidence.  To meet his burden, Tweedie relies

entirely on collateral estoppel principles.  The only evidence adduced at trial by Tweedie is the

---

[10] The words "maliciously, wilfully and wantonly" were used in one place in the
Arbitration Award.  The "Damages" section referred to injuries "maliciously, wilfully and
wantonly inflicted" in discussing Tweedie's possible entitlement to exemplary damages.  Such
damages are recoverable in Michigan under certain circumstances to fully compensate a
plaintiff.  But because the Arbitrator found that Tweedie was already fully compensated through
treble damages and the reimbursement of attorney fees, the Arbitration Award stated that he was
not entitled to exemplary damages.  This further supports the Court's reading of the Arbitration
Award as not finding a debt for willful and malicious injury.  The Arbitrator did not determine
this issue.

Arbitration Award and copies of some of the pleadings from the State Court Lawsuit. The Arbitration Award found that there is a debt owing and that it is in the amount of $5,442,846.47.

The Court is required by principles of collateral estoppel under Michigan law to respect and give full faith and credit to the Arbitration Award to the extent that the issues in this adversary proceeding are identical, and to the extent that such issues were actually litigated and necessarily determined by the Arbitrator after a full and fair opportunity was given to all parties. But that does not mean that the Court must find that all of the Arbitration Award is a non-dischargeable debt. It is hard for the Court to follow the Arbitrator's analysis and reasoning in arriving at this award when the total amount of all of the advances ever made by Tweedie to the Debtor or the Debtor's Companies aggregate only $378,297.58. At times, the Arbitration Award is convoluted and inconsistent, making the application of collateral estoppel principles especially challenging. As explained in the opinion, many of the Arbitrator's findings of fact are not entitled to preclusive effect. But even after sweeping those away, there are some findings of fact that are clear, definite and unequivocal. They are entitled to preclusive effect.

The Court finds that none of the Arbitration Award is non-dischargeable under either § 523(a)(4) or (6) of the Bankruptcy Code. But the Court does find that the Arbitration Award establishes that there is a debt that is non-dischargeable under § 523(a)(2)(A). The total amount advanced by Tweedie based on his reliance upon misrepresentations and false pretenses by the Debtor is $378,297.58. That is the aggregate sum that Tweedie borrowed from Alden State Bank and that Tweedie is required to pay back to Alden State Bank. In the "Damage Description" section of the Arbitration Award, the Arbitrator found among the actual damages an outstanding balance owing by Tweedie to Alden State Bank of $310,987.00. That is the only amount of Tweedie's loss

-69-

that was proximately caused by Tweedie's reliance on the Debtor's misrepresentations and by the

Debtor's false pretenses.  Therefore, that is the only portion of the Arbitration Award that is non-

dischargeable under § 523(a)(2)(A) of the Bankruptcy Code.  The balance of the Arbitration Award

is a dischargeable debt.  The Court will enter an order consistent with this opinion.[11]

.

**Signed on February 14, 2012**

                                        **_/s/ Phillip J. Shefferly_**
                                        **Phillip J. Shefferly**
                                        **United States Bankruptcy Judge**

---

[11] The Court has considered all of the evidence in the record made in this adversary proceeding, each and every finding of fact and conclusion of law in the Arbitration Award, and all of the arguments made by Tweedie and the Debtor in their respective post-trial briefs, even if they are not all specifically mentioned in this opinion.

-70-